## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

EDWARD SKOLARUS, JAMES SMALL, and
STEVEN TORTOLANI, on behalf of
themselves and all others similarly situated,

              Plaintiffs,

    v.

BLOOMBERG, L.P. and BLOOMBERG
INDEX SERVICES, LTD.,

             Defendants.

---

CASE NO.

**CLASS ACTION COMPLAINT**

---

Plaintiffs Edward Skolarus, James Small, and Steven Tortolani, individually and on behalf of all others similarly situated, for their claims against defendants Bloomberg, L.P. and Bloomberg Index Services, Ltd. and allege the following based on personal knowledge as to Plaintiffs and Plaintiffs' own acts, and on information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys:

### SUMMARY OF DISPUTE

1.      Utility companies issue Recovery Bonds to fund large infrastructure projects. Investors purchase Recovery Bonds and electricity customers repay the bond amounts plus interest via monthly charges on their bills. In mid-2022, Bloomberg, the company responsible for indexing securities in the $40 trillion U.S. fixed-income market, intentionally misclassified these Recovery Bonds, causing millions of electricity consumers to pay inflated interest rates. This case involves three Recovery Bond issuances, two in California (issued by Pacific Gas & Electric ("PG&E") and Southern California Edison ("SCE"), respectively) and one in Texas (issued by Electric Reliability Council of Texas ("ERCOT").

2.      For years, Bloomberg classified Recovery Bonds as corporate bonds primarily because by law, and by the terms of the bonds themselves, the bonds are repaid by electricity customers via monthly charges on their bills and thus carry little if any risk. As long as the utility continues to provide electricity service in its territory, the customers repay the bonds. But in 2022, with the dollar amount of these Recovery Bonds reaching new heights, Bloomberg caved to requests from institutional investor clients that wanted a higher return on Recovery Bonds. These institutional investors are some of Bloomberg's largest customers in both its indexing business and its more lucrative financial data terminal business. Although nothing changed to make these bonds any riskier or otherwise materially different, Bloomberg disregarded its own best indexing practices and the law in reclassifying utility Recovery Bonds from "corporate bonds" to "asset-backed securities." Bloomberg knew that misclassifying the bonds would increase the perceived risk of the bonds and shrink the pool of investors allowed to purchase the bonds. Bloomberg also knew that, as a result, the interest rates on the bonds would rise, forcing tens of millions of everyday Americans, many of whom are just trying to make ends meet, to pay inflated interest.

3.      Bloomberg's misclassification improperly increased the monthly electric utility payments for tens of millions of people in California and Texas[1] for the next approximately twenty years. Bloomberg reclassified Recovery Bonds as "asset-backed securities" despite, *inter alia*, the SEC confirming in 2007 that Recovery Bonds are not asset-backed securities. This

---

[1] PG&E, SCE, and ERCOT collectively serve electricity to over 50 million customers. https://www.ercot.com/about (ERCOT "manages the flow of electric power to more than 27 million Texas customers -- representing about 90 percent of the state's electric load."); https://www.pge.com/en/about/company-information/company-profile.html (PG&E "provides natural gas and electric service to approximately 16 million people throughout a 70,000-square-mile service area in northern and central California."); https://www.edisoncareers.com/about-sce/ (SCE "proudly serve[s] approximately 15 million people in a 50,000-square-mile service area within Central, Coastal and Southern California.").

lawsuit seeks to hold Bloomberg accountable for the overpayments it caused, and will continue to cause, California and Texas electricity customers to incur.

4.    Prior to the 2012 LIBOR scandal, markets, regulators, and the public believed that the interest rate set by LIBOR was a fact-based, fair, and objective financial benchmark. The LIBOR scandal showed it was not. The few institutions that controlled it manipulated the interest rate to benefit themselves and their biggest customers. The LIBOR financial benchmark manipulation caused billions of dollars to be shifted, not based on facts, rules, or objective measures, but on the subjective whim of the institutions controlling the benchmark.

5.    In the decade since the LIBOR scandal broke, largely to regain the trust of the markets, regulators, and the public (and delay government regulation), financial benchmark creators established objective, transparent, rules-based standards and, through trade organizations, promised to abide by these standards, vowing not to subjectively manipulate benchmarks to benefit themselves or their largest customers.

6.    Benchmark creators are regulated in the European Union, United Kingdom, South Korea, Japan, Singapore and Australia, but have avoided regulation in the United States. For years, Bloomberg has both publicly and through its membership in IOSCO[2] or IIA[3] said it would

---

[2] The International Organization of Securities Commissions ("IOSCO") promulgated its Principles for Financial Benchmarks after the LIBOR financial benchmark manipulation came to light and "raised concerns over the fragility of [benchmarks] – in terms of both their integrity and their continuity of provision - that has the potential to undermine market confidence potentially harming both investors and the real economy." https://www.iosco.org/library/pubdocs/pdf/IOSCOPD415.pdf.

[3] The Index Industry Association ("IIA") is the global trade association for the index industry established in 2012 (about the time the LIBOR scandal came to light). https://www.indexindustry.org/ ("The IIA's mandate is to educate investors on the attributes and role of indexes within the investment process … and to push for industry standards of best practice, independence and transparency."). Bloomberg Index Service's former CEO and Bloomberg LP's Global Head of Indices, Steve Berkley, is a member of IIA's Leadership Team. https://www.indexindustry.org/insights/dan-draper-chairman-of-iia-on-transparency-independence-and-integrity-as-the-bedrocks-of-indexing/ ("The IIA and its members recognize their important contributions to and role in the broader financial ecosystem and will continue to uphold the highest standards of integrity and transparency in our industry to promote sustainable global financial markets….").

follow their objective, transparent, and rules-based principles here in the U.S. (as it must in the EU, UK, and other regulated countries).[4]

7.      In addition, Bloomberg has published its own Bloomberg Fixed Income Index Methodology (herein, the "Methodology") detailing how it "objectively" and "transparently" makes "rules-based" decisions using "best practices," "good governance," and conflict of interest principles. Bloomberg has thus represented that it will not act arbitrarily and will not manipulate any financial benchmarks to benefit itself or its customers.

8.      Bloomberg also publicly says that its corporate "values" are always to "do the right thing."[5] Bloomberg portrays itself as an honest umpire for the fixed-income market – it supposedly calls "balls and strikes" based on facts and rules.

9.      Over the last decade, index investing has grown significantly. Along with it, the power of financial benchmark creators generally, and of Bloomberg particularly, have grown as well. As the stakes have grown, so have the incentives to manipulate financial benchmarks. Thus, the need for objective, transparent, rules-based benchmark decisions has never been greater.

10.     Bloomberg is by far the most important benchmark creator for the U.S. fixed-income market. Bloomberg's fixed income benchmarks in the bond market are even more influential than the Dow Jones/S&P indices are in the stock market (which has several powerful index providers). Thus, Bloomberg's classification decisions have unmatched market influence

---

[4] *See* https://www.bloomberg.com/professional/products/indices/resources/regulation/#benchmark-regulation-details
(Bloomberg "was authorized by the UK's Financial Conduct Authority [FCA] to conduct benchmark administration under the BMR. BISL may be found on the FCA's register…").

[5] *See* https://www.bloomberg.com/company ("Discover our values — and how we live them. We believe profit and principles are not mutually exclusive. They reinforce one another. And doing the right thing — by our people, our customers, our communities and our planet — is also the best thing for our business.").

which heightens the need for objective, transparent, rules-based decisions and magnifies the potential harm of manipulative misclassification.

11.    Bloomberg is a "triple threat" in the fixed-income market: it is the dominant index provider, data provider (Bloomberg terminals), and price reporting service. In the fixed-income market – where securities are sometimes more obscure, trade less frequently, and where information overall is scarcer compared to the equities market – Bloomberg is the dominant source of information for what a bond is (index administration), what it is worth (price reporting), and what is happening with it (data). The fixed-income market relies on Bloomberg's accuracy and honesty.

12.    From 2016, when it acquired the fixed-income indexes from Barclays and assumed its dominant role, through mid-2022, Bloomberg classified Recovery Bonds as corporate bonds. During this time, both Bloomberg's data group (responsible for reviewing almost every bond issued and deciding how to classify them) and index group consistently classified Recovery Bonds as corporate bonds. Other index providers, governmental financial regulators, and self-regulatory institutions (including the SEC, FASB, FINRA, and the EU) also confirmed that Recovery Bonds were corporate bonds – part of a large, diverse universe of bonds that are permitted investments of most institutional investors. Recovery Bonds' prospectuses likewise routinely say they are not asset-backed securities and the issuer is not an asset-backed issuer. Thus, there was widespread consensus that Recovery Bonds were corporate bonds, not asset-backed securities.

13.    Indeed, Recovery Bonds are intentionally structured to meet the criteria of corporate bonds - so they can be sold in the deeper, more liquid corporate bond market, obtain

lower rates, and benefit the millions of people who pay off these bonds when paying their electricity bills.

14.     Until very recently, Recovery Bonds were a tiny fraction of the overall bond market. New issuances each year were relatively rare and modest in size, and the total amount of these bonds that were outstanding was shrinking (from around $10 billion in 2012 to about $5 billion in 2020). With comparatively few new issuances of Recovery Bonds to invest in, there was little financial incentive to manipulate the classification of Recovery Bonds.

15.     In the past couple of years, however, that changed significantly. In 2022, new issuances of Recovery Bond issuances, alone, were about $20 billion, bringing the total amount outstanding to levels significantly higher than they had been. Further, because of climate-related events, Recovery Bond issuances were predicted to remain well above historical averages for the foreseeable future. So far, those predictions have been correct. During a six-week span in the summer of 2022 alone, utilities issued over $6 billion of new Recovery Bonds. And another $7 billion were issued in 2023. As the Recovery Bond market grew, so did the financial incentives to misclassify Recovery Bonds.

16.     In mid-2022, after years of public statements about adhering to objective, transparent, and rules-based principles, and during a six-week span when $6 billion of new Recovery Bonds were being issued, Bloomberg misclassified Recovery Bonds. Departing from its own standards and Methodology and the collective wisdom of issuers, underwriters, independent professional organizations, and even its own data personnel, Bloomberg changed its classification of Recovery Bonds from corporate bonds to "asset-backed securities," which are a more complex, riskier, and less widely purchased type of security. Bloomberg made the change not based on any actual change to the structure or risk factors of the bonds. Rather, Bloomberg

made this change at the request of some its largest institutional investor clients that stood to benefit greatly from the change. Because many institutional investors' investment policies preclude them from investing in asset-backed securities, and because asset-backed securities are perceived as a riskier investment and have a less extensive secondary market than corporate bonds, the market for asset-backed securities is much smaller and commands higher interest rates compared to corporate bonds of the same rating. Because of Bloomberg's classification change, Bloomberg's customers that were allowed to participate in the asset-backed market could buy AAA-rated Recovery Bonds, virtually guaranteed to be paid off by California and Texas electricity consumers pursuant to legislative authorization, and benefit from higher interest returns than they would have received if Bloomberg properly classified them as corporate bonds.

17.     Bloomberg's classification change – including the timing, process, and substance – violated the law in the U.S., EU, and U.K., as well as Bloomberg's own "Methodology," policies and practices, IOSCO Principles, and IIA standards. Instead of being transparent about its decision, Bloomberg misrepresented facts and its decision-making process.

18.     Tellingly, Bloomberg's own data group still classifies Recovery Bonds as corporate bonds; on Bloomberg's terminals, Recovery Bonds continue to have a corporate ticker symbol ("CORP"). It was only Bloomberg's index group – that is supposed to make objective decisions uninfluenced by customers' demands – that reclassified Recovery Bonds at its large customers' request.

19.     Bloomberg's conduct alleged herein has harmed, and for years will continue to harm, Plaintiffs and the class members in the form of increased interest payments on their electricity bills. With respect to the three Recovery Bonds at issue in this case, Bloomberg's

conduct will cause the customers of these utilities to pay hundreds of millions of dollars in additional interest over the life of the bonds.

20.    Bloomberg knew that its reclassification scheme violated the law, industry standards, and its own Methodology. Bloomberg also knew that its conduct alleged herein would result in improperly inflating the repayment charges that would be assessed each month on the utility bills of the customers of these three utilities.

21.    This case concerns three Recovery Bonds that Bloomberg misclassified: (1) ERCOT Texas Stabilization Subchapter N Bonds (June 2022; $2.1 billion); (2) PG&E Senior Secured Recovery Bonds, Series 2022-A (Nov. 2022; $983 million); and (3) SCE Senior Secured Recovery Bonds, Series 2023-A (Apr. 2023; $775 million).

22.    Plaintiffs bring this class action on behalf of themselves and the other electricity customers of SCE, PG&E, and ERCOT who have been charged, and will continue to be charged, excess Recovery Bond repayment charges each month as a result of Bloomberg's misconduct, seeking legal and equitable relief for the excess monthly payments they have been and will be required to pay, including requiring Bloomberg to fund utility bill credits sufficient to offset the excess monthly payments Plaintiffs and the classes will be required to make through the life of the Recovery Bonds at issue, and enjoining Bloomberg from engaging in the misconduct alleged herein going forward.

## JURISDICTION AND VENUE

23.    This Court has jurisdiction over the subject matter of this case under the Class Action Fairness Act of 2005 ("CAFA") because members of each of the classes is a citizen of a state different from that of the defendants and the matter in controversy exceeds $5,000,000 exclusive of interest and costs. Plaintiffs are citizens of California and Texas. Defendants are citizens of New York and the United Kingdom. Therefore, diversity of citizenship exists under

28 U.S.C. § 1332(d)(2)(A). None of the exceptions to CAFA jurisdiction applies, and the total number of members of each of the proposed classes is greater than 100. 28 U.S.C. § 1332(d)(5)(B).

24.     Venue is proper under 28 U.S.C. § 1391(a)(3). Defendants are subject to personal jurisdiction in this District. Defendants conduct business in this District, including selling various products and services to residents of this District. Defendants are headquartered in this District. Further, a substantial portion of the events or omissions giving rise to the claims asserted herein occurred in this District.

25.     In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, United States mail, interstate telephone communications and the facilities of the national securities exchange.

## **PARTIES**

26.     Plaintiff Edward Skolarus is a resident of Manhattan Beach, California. Since before June 2022, and continuing to the present, Plaintiff Skolarus has been a customer of SCE electrical service. Plaintiff Skolarus expects to remain a resident of the area served by SCE electrical service, and to remain a customer of SCE electrical service, for the foreseeable future. Plaintiff Skolarus has paid and will continue to pay more in recovery bond charges each month because of Defendants' wrongful actions alleged herein. Non-party SCE supplies electric energy to 15 million people in central, coastal and southern California. SCE is a wholly owned subsidiary of Edison International.

27.     Plaintiff James Small is a resident of Los Altos, California. Since before June 2022, and continuing to the present, Plaintiff Small has been a customer of PG&E electrical service. Plaintiff Small expects to remain a resident of the area served by PG&E electrical

service, and to remain a customer of PG&E electrical service, for the foreseeable future. Plaintiff Small has paid and will continue to pay more in recovery bond charges each month because of Defendants' wrongful actions alleged herein. Non-party PG&E provides natural gas and electric service to approximately 16 million people throughout a 70,000-square-mile service area in northern and central California.

28.     Plaintiff Steven Tortolani is a resident of Dallas, Texas. Since before June 2022, and continuing to the present, Plaintiff Tortolani has been a customer of ERCOT electrical service and of PowerNext, a downstream retail electricity provider in the ERCOT system. Plaintiff Tortolani expects to remain a resident of the area served by ERCOT electric service, and to remain a customer of ERCOT electrical service, for the foreseeable future. Plaintiff Tortolani has paid and will continue to pay more in recovery bond charges each month because of Defendants' wrongful actions alleged herein. Non-party ERCOT manages the flow of electric power to more than 27 million Texas customers, representing about 90 percent of the state's electric load.

29.     Defendant Bloomberg L.P. is a privately held financial, software, data, and media company headquartered in New York City. Bloomberg L.P. has approximately 176 locations and nearly 20,000 employees. Bloomberg L.P. provides financial software tools and enterprise applications such as analytics and equity trading platform, data and index services, and news to financial companies and organizations through the Bloomberg Terminal (via its Bloomberg Professional Service), its core revenue-generating product.

30.     Defendant Bloomberg Index Services Limited ("BISL") was formed in connection with Bloomberg L.P.'s 2016 acquisition of Barclays index business (Barclays Risk Analytics and Index Solutions Ltd (BRAIS)). BISL is a wholly owned subsidiary of Bloomberg

L.P. BISL is a private limited company, limited by shares, domiciled and incorporated in the United Kingdom and has branches in the United States (as well as Japan and Singapore) and conducts business throughout the United States, including in New York. This Complaint refers to Defendants Bloomberg L.P. and BISL collectively as "Defendants" or "Bloomberg."

31.     Plaintiffs are informed and believe and thereon allege that at all times herein, each of the Defendants, or their agent, servant, employee, lessee, licensee, assignee, and/or successor-in-interest, was acting within the purpose and scope of said agency, service, employment, bailment, lease, license, assignment, and/or interest, and with the consent, commission and knowledge of their co-defendant.

32.     Unless otherwise indicated, each Defendant is the agent, co-conspirator, joint venturer, partner, and/or employee of the other Defendant and, as alleged, has been acting within the course and scope of said agency, conspiracy, joint venture, partnership and/or employment, with the knowledge and/or consent of the co-defendant. Moreover, Plaintiffs are informed and believe and thereon allege that each Defendant has authorized and/or ratified the wrongful activities of the other Defendant.

33.     Plaintiffs are informed and believe, and thereon allege, that BISL and Bloomberg, L.P. are alter egos in that they have a unity of interests and overlapping ownership, officers, and managers such that the separate personalities of the entities does not exist, and if the acts of each entity are treated as those of separate businesses, an inequitable result will follow. This includes, without limitation, that the conduct of BISL concerning and related to the classification of Recovery Bonds in its indexes as described herein was done with the knowledge and consent, and/or at the behest of Bloomberg L.P.  Further, the wrongful conduct alleged herein was done by Defendants' officers, directors, and/or managing agents.

## CLASS ACTION ALLEGATIONS

34.    Plaintiffs bring this action as a class action under Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3) on behalf of the following three classes:

a.    SCE Class: All past, current, and future customers of SCE electricity service who, since April 2023, have paid and/or will continue to pay one or more monthly recovery bond charges related to the recovery bond(s) known as SCE Senior Secured Recovery Bonds, Series 2023-A (issued April 2023).

b.    PG&E Class: All past, current, and future customers of PG&E electricity service who, since November 2022, have paid and/or will continue to pay one or more monthly recovery bond charges related to the recovery bond(s) known as PG&E Senior Secured Recovery Bonds, Series 2022-A (issued November 2022).

c.    ERCOT Class: All past, current, and future customers of ERCOT electricity service who, since June 2022, have paid and/or will continue to pay one or more monthly recovery bond charges related to the recovery bond(s) known as ERCOT Texas Stabilization Subchapter N Bonds (issued June 2022).

35.    The requirements of Federal Rule of Civil Procedure 23(a) are satisfied.

36.    Numerosity: The members of each of the classes are so numerous and geographically dispersed that joinder of all members is impracticable. While the exact number of class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, there are already millions of electricity customers of each of SCE, PG&E, and ERCOT that have paid recovery bond charges for the Recovery Bonds at issue during the class period.

37.    Commonality and Predominance: Common questions of law and fact exist as to Plaintiffs and the classes, and those questions predominate over any questions, if any, solely

affecting individual members of the classes. The common questions include but are not limited to:

- whether Defendants' conduct alleged herein violated the common law, including negligence, intentional interference with contractual relationship, tortious interference with contract, intentional interference with prospective economic advantage, and/or negligent interference with prospective economic advantage;

- whether Defendants' conduct alleged herein violated California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*;

- whether Defendants' conduct alleged herein was willful and intentional;

- whether Plaintiffs and the other members of the classes have sustained damages and, if so, what is the proper measure of damages; and

- whether injunctive and/or other equitable relief are appropriate.

38.    Typicality: Plaintiffs' claims are typical of the claims of the members of the classes. Plaintiffs' claims and those of the classes arise out of the same course of conduct by Defendants and are based on the same legal theories.

39.    Adequacy: Plaintiffs will fairly and adequately protect the interests of the members of the classes. Plaintiffs have retained counsel competent and experienced in class and other complex litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the classes.

40.    Superiority: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Joinder of all members is impracticable. Further, the damages suffered by individual class members is relatively small. The expense and burden of individual litigation make it impracticable, if not impossible, for members of the classes to individually redress the wrongs done to them. Plaintiffs do not foresee any difficulty in the management of this action as a class action.

41.     This action should be maintained as a class action for the additional reason that the risks of separate actions by individual class members would create a risk of: (a) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for Defendants; and/or (b) adjudications with respect to individual class members would, as a practical matter, be dispositive of the interests of other class members not party to the adjudication or would substantially impair or impeded their ability to protect their interests.

42.     Defendants have acted or refused to act on grounds generally applicable to the classes, thereby making appropriate final injunctive or declaratory relief.

## GENERAL FACTUAL ALLEGATIONS

### I.    The Libor Scandal Revealed The Need For Objective Indexing Standards

43.     In 2012, the LIBOR scandal revealed that one of the world's most influential benchmark interest rates was not objectively determined but had been manipulated by various banks for years. A "benchmark" is a standard that investors use to measure the performance of securities, such as equities and fixed income assets.

44.     An "index" is a collection of stocks or fixed-income assets with certain common characteristics that reflect the market as a whole or a particular industry or segment of the market.

45.     Index providers are important participants in the modern global financial market. Corporations (including utilities), investors, financial institutions, fund managers, regulators, and analysts use and rely on indexes for a number of purposes, including to: identify investments that meet their eligible/permitted investment criteria; monitor the performance of the market (or a segment of it); compare, as a benchmark, the performance of their own portfolio; and, as with the LIBOR index, determine the proper interest rate to charge for a loan.

46.    The LIBOR interest rate benchmark was determined by reference to interest rates submitted by participating banks; it varied depending on the rates submitted. The LIBOR rate was considered to be an objective standard and was used to determine everything from the interest rates that large corporations paid for loans, to the rates that consumers paid for mortgages. In 2012, it was discovered that traders at the participating banks had been submitting artificially low or high interest rates to increase profits for themselves and/or their biggest customers.

47.    The LIBOR benchmark manipulation caused financial contracts to be mispriced throughout the world, including billions of dollars of mortgages, corporate fundraising, and derivative trades.

48.    The LIBOR scandal changed the index landscape in multiple respects. Among other things, it opened the eyes of regulators to potential conflicts of interest and the financial impact an indexer can have. And, it relatedly opened regulators' eyes to the need for appropriate protections to prevent index manipulation. The LIBOR scandal also made regulators aware of the size and breadth of the index provider industry.

49.    In response to the LIBOR scandal, the world's two leading organizations that create standards for financial benchmarks – IOSCO and IIA – both promulgated objective, transparent, rules-based standards to prevent their members from subjectively manipulating benchmarks. Government regulators around the globe, including the EU's BMR and the United Kingdom's FSMA which oversee Bloomberg's index business, rely on benchmark administrators' adherence to IOSCO principles in their regulatory oversight processes.

50.    IOSCO promulgated its Principles for Financial Benchmarks after the LIBOR scandal came to light and "raised concerns over the fragility of [benchmarks] - in terms of both

their integrity and their continuity of provision - that has the potential to undermine market

confidence potentially harming both investors and the real economy."

https://www.iosco.org/library/pubdocs/pdf/IOSCOPD415.pdf.

51.     IOSCO says there are "broad, generic risks to the credibility of Benchmarks

arising from vulnerabilities in the Benchmarks' Methodology, transparency and governance

arrangements...these risks arise from incentives stemming from conflicts of interests, which may

be amplified when Expert Judgement is used in Benchmark determinations...there may be

conflicts of interests in and incentives to manipulate the determination process where the

Submitters are also Market Participants with stakes in the level of the Benchmarks. Furthermore,

there may be other conflicts of interests and opportunities for manipulative conduct created by

the possibility of voluntary and/or selective Submissions, the varied composition of Submitters,

and discretion in the selection of data to be submitted...[or] submitting false or misleading data or

by attempting to influence personnel [] responsible for the exercise of Expert Judgment."

https://www.iosco.org/library/pubdocs/pdf/IOSCOPD415.pdf (pp. 3-4).

52.     Index providers must adhere to IOSCO principles and they frequently use major

accounting firms to audit their compliance.

53.     With respect to the IIA, it states: "Index providers create, maintain, and govern

the calculation and maintenance of an index and its methodology." "[I]ndex providers serve a

central and pivotal role in facilitating market access and investment democratization."

54.     IIA's members, all of which are index providers, promise to adhere to the

following "truths" about indexes - that they "measure market activities, not create or distort

them," are "transparent," and "operate according to industry-standard methodology and best

practices." https://www.indexindustry.org/advocacy/ ("The IIA and its members have led the

industry to adopt the highest standards. IIA members are required to adhere to the IIA Best Practices, IOSCO Principles, and local regulations.").

55.    IIA's Best Practices say that index providers "shall take appropriate steps to identify and address conflicts of interest…establish clear boundaries between index calculation [] and other business/commercial functional areas…[and] ensure that personal interests or business connections do not compromise the [index provider's] performance of its functions…." IIA's Best Practices also say that index providers "shall ensure that its indices are calculated in accordance with its methodologies…[and] establish policies and procedures to ensure that its indices can be calculated on a consistent, regular, and timely basis.…" https://www.indexindustry.org/iia-best-practice-guidelines/.

## II.    **The Increasing Power Of Index Providers**

56.    In 2022, the SEC noted that "The role of index providers…has grown in size and scope in recent years, significantly changing the face of the asset management industry … [and] also rais[ing] potential concerns about investor protection and market risk…. Index providers compile, create the methodology for, sponsor, administer, and/or license market indexes. They typically determine the particular 'market' (which may be a sector or other group of securities) that the index measures, the index constituents that measure that market, and the weightings that each constituent receives….These activities leave room for significant discretion—for example, an index provider typically has the ability to make changes to the index by adding or dropping particular constituents (i.e., index reconstitution)…." https://www.govinfo.gov/content/pkg/FR-2022-06-22/pdf/2022-13307.pdf.

57.    With discretion comes responsibility. Index providers say their decisions to include or exclude certain stocks, bonds, or countries are rules-based, driven by impartial analysis of the size, liquidity, and overall "investability" of respective markets. "Investors'

decisions to invest in the market are significantly guided by [index providers'] decisions, whether they put you in the index or do not put you in the index. They do control the fates of companies' and countries' access to capital markets." *Id.*

58.    Bloomberg has a dominant market position in the fixed-income index universe. Bloomberg says that its indices are "the market standard for fixed income investors…are the most widely used fixed income and inflation-linked benchmarks and are an integral part of the active and passive global portfolio management processes….[Bloomberg] has continually been recognized as the top index provider." (Methodology, p.5.) Bloomberg's dominant position in this area gives it the power not only to add or drop particular bonds, but (of particular relevance to this action) to dictate how bonds will be classified.

### III.    With Increasing Power Comes Increasing Risk of Manipulation

59.    Experts have commented on the increasing power of benchmark creators and the danger of manipulating the market. One explains:

> "[T]he rise of passive investing raises concerns that index
> providers may have too much control over the market. Index
> providers often make key decisions about the makeup of indices,
> yet they are not regulated within the United States. Although index
> providers publish a great deal of methodology documents on their
> websites, they are not as easily accessible as the disclosures that
> funds must provide, nor are they presented in a uniform manner
> that is easier for investors to understand. The lack of regulatory
> oversight for index providers can lead to a number of negative
> results. Investors may lack transparency about the indices that their
> funds invest in; the indices themselves may be subject to market
> manipulation; and index providers' decisions to reclassify
> economies into either frontier, developed, or emerging markets
> categories can affect public perception or investor access to a
> country's economy.[6]

---

[6] McCarthy, Jenna, *Benchmarking the World: A Proposal for Regulatory Oversight of Stock Market Index Providers* (Mar. 1, 2018), available at SSRN: https://ssrn.com/abstract=3150659

60.    Manipulation of an index can happen in a number of ways, for example excluding a security from an index (making it less marketable), or classifying it as an asset-backed security (a more complex, and smaller investor base investment) versus a corporate bond (an investment with a broad investor base).

61.    In an unregulated market, an index provider operating subjectively can manipulate the market by misclassifying a less complex and highly rated investment as a higher-risk and/or more complex type of investment, thereby allowing its customers to limit competition for that investment and obtain a higher return than they would receive if the investment was correctly classified.

62.    Some investors have an incentive to persuade the index provider to reclassify an investment to limit competition. For example, fewer investors are willing or permitted to purchase bonds classified as asset-backed securities because they are perceived as riskier and less liquid investments. Misclassifying Recovery Bonds as asset-backed securities allows certain Bloomberg customers to receive a higher return on an investment that is relatively less complex and low-risk.

63.    The potential for market manipulation by index providers is not merely theoretical. New research suggests that index providers may be tweaking their inclusion criteria to benefit issuers with which they have a financial relationship. Law review articles in recent years have noted the same powerful (and growing) incentives to manipulate financial benchmarks and recommend government regulation to prevent manipulation and protect investors, markets, and the economy.

64.     In addition to IOSCO, the European Securities and Market Authority ("ESMA") is an independent EU authority whose purpose is to improve investor protection and promote stable and orderly financial markets.

65.     ESMA published the EU Benchmarks Regulation ("BMR") in June 2016, with most rules taking effect January 1, 2018. The BMR is legally binding on members of the EU. Some of the BMR's key provisions include requiring EU administrators of a broad class of benchmarks to be authorized or registered by a national regulator, and for these administrators to implement various governance systems and other controls to ensure the integrity and reliability of their benchmarks.[7]

66.     Bloomberg's index business is overseen by EU's BMR and the United Kingdom's Financial Control Authority.

67.     U.S. regulators have likewise started looking into index providers and the potential for conflicts and resulting manipulation. In 2022, the SEC announced it was preparing to investigate index providers over alleged conflicts of interest. As one commentator remarked:

> The issue is rising in significance given the explosive growth of passive investment vehicles, most notably index funds, that seek to replicate the performance of various market indexes…"The choice to include or not include a [security]…is subject to very little oversight, and it raises potential conflicts of interest that have never been addressed by financial regulators." "Trillions of dollars are tied to the performance of indexes, yet it's not always clear how indexes are constructed or governed. Investors who depend on indexes for their retirement or their children's education deserve to know how their money is being invested and that the investment is in their best interest."[8]

---

[7] ESMA, Benchmark Administrators, available at https://www.esma.europa.eu/esmas-activities/investors-and-issuers/benchmark-administrators.

[8] M. Kolakowski, SEC May Investigate Index Providers (Investopedia 1/31/22) https://www.investopedia.com/sec-may-investigate-index-providers-5217593.

IV.     **Bloomberg's Position of Power and Influence in Fixed-Income Indexing and Its Purported Standards**

68.     "For nearly fifty years, [Bloomberg's (formerly called Barclays until Bloomberg acquired the business in 2016)] indices have been the market standard for fixed income investors…are the ***most widely used*** fixed income and inflation-linked benchmarks and are an ***integral part*** of the active and passive global portfolio management processes….[Bloomberg] has continually been recognized as ***the top index provider***." (Methodology, pp. 2-5) (emphasis added)

69.     Bloomberg is the most important and powerful index provider for the $40 trillion U.S. fixed income market. As a member of IIA, Bloomberg represented that it adheres to principles of independence and transparency and upholds standards of integrity.

70.     For example, Bloomberg has said that it makes indexing decisions using an objective, transparent, fact-based "Methodology" and "best practices," "determined by clearly defined, published eligibility criteria," and "continually monitored and reviewed [] through a formal governance process." Bloomberg further represents that it "evaluates all publicly available information…to assign the most appropriate classification" whether doing an initial methodology decision or an annual review. (Methodology, pp. 12, 20-21).

71.     In addition, Bloomberg says that it may use "expert judgment," and when it does so it "undertakes to be consistent in its application, with recourse to written procedures outlined in this Methodology and internal procedures manuals…[and] also ***maintains and enforces a code of ethics to prevent conflicts of interest from inappropriately influencing index construction***..." (Methodology, p. 105) (emphasis added).

72.     Bloomberg's Methodology is consistent with Bloomberg's asserted adherence to the EU's BMR and IOSCO Principles that "represent a fair and practical standard" that "provides

confidence to market participants regarding the reliability, transparency and openness of our index decisions."[9] Bloomberg similarly says that its Methodology is consistent with IIA's Best Practices.

73.     Bloomberg's "code of ethics," "good governance," "best practices," and asserted adherence to IOSCO Principles and IIA's Best Practices prohibit it from being "inappropriately influenc[ed]" by opinions of financially-interested customers – e.g., customers advocating for a bond to be indexed one way so that it would result in more money for those customers. The EU's BMR and UK's FSMA similarly proscribe such improper influence.

74.     Bloomberg has thus repeatedly represented that it is a fair and principled judge when making index decisions and does not classify bonds subjectively or allow self-interested customers to influence its decisions.

## V.     **Recovery Bonds**

75.     Recovery Bonds are sold by electric utility companies to "recover" the costs of large, often one-time, expenses.

76.     Recovery Bonds have been described as "unusually secure." One analyst stated, "If you want something that's rock solid, where you don't have too much to worry about over long periods, there's really nothing else . . . There's the credit protection, there's the absence of political interference, there's the obligation of all ratepayers, and finally there's this superior return over long time periods."[10] Recovery Bonds are backed by state laws guaranteeing that payments will continue even if the utilities go bankrupt.

---

[9] Nov. 6, 2015 Bloomberg Article https://www.prnewswire.com/news-releases/bloomberg-confirms-alignment-of-key-indices-with-the-international-organization-of-securities-commissions-iosco-principles-for-financial-benchmarks-300174200.html.

[10] 9/29/22 Insurance Journal Article – Intensifying Storms are Fueling a Record $17 Billion Bond Barrage -- https://www.insurancejournal.com/news/national/2022/09/29/687228.htm.

77.     In a May 2022 article, Bloomberg described Recovery Bonds as follows:

> "Money managers scouring the credit markets for yield are being
> **seduced** by a relatively rare type of security -- so-called recovery
> bonds -- for their **attractive spreads, duration and safety…
> investors are eating them up**. Utility giant PG&E Corp. recently
> issued $3.6 billion of recovery bonds [in May 2022] -- aimed at
> recouping costs caused by the wildfires that ravaged California in
> 2017 -- in a deal that has **both structured and corporate investors
> jostling for orders**…. **For corporate investors**, who usually do not
> play in structured products, **the appeal is even greater** given the
> high-quality AAA ratings of the notes which is not often seen in
> the corporate world.[11]

## VI.     Bloomberg Reclassifies Recovery Bonds in 2022

78.     From 2016 (when it acquired Barclays) until 2021, Bloomberg appears to have
followed IOSCO Principles, IIA's Best Practices, EU's BMR, and its own Methodology in
deciding that Recovery Bonds were corporate bonds, not asset-backed securities.

79.     In 2022, however, at a time when Recovery Bond issuances had increased
significantly and were projected to remain at elevated levels in the coming years, Bloomberg
received requests from some of its biggest institutional investor customers to reclassify Recovery
Bonds from corporate to asset-backed. Bloomberg knew that such reclassification would falsely
signal that Recovery Bonds were risky and would limit competition for the bonds because the
investment guidelines for many institutional investors prohibit purchasing asset-backed
securities. Moreover, the secondary market for asset-backed securities is significantly smaller
than that for corporate bonds. Thus, Bloomberg knew that reclassification would allow some of
its large investor customers who are permitted to participate in the market for asset-backed
securities to buy more Recovery Bonds and at a higher rate (i.e. wider spread).

---

[11] 5/6/22 Bloomberg Article by Carmen Arroyo - https://www.bloomberg.com/news/articles/2022-05-06/structured-weekly-investors-bet-big-on-recovery-bonds (emphasis added).

80.     The Bloomberg customers seeking a change in Bloomberg's classification of Recovery Bonds were significant customers of both Defendant BISL and its parent company, Defendant Bloomberg L.P., which sells Bloomberg Terminals that drive the majority of Bloomberg L.P.'s profits.

81.     As Bloomberg knew, the requests to reclassify Recovery Bonds in this manner were not driven by any legitimate doubt or disagreement about the proper classification of these bonds or by a desire, for example, to solve any index problem or improve index customers' experience. Bloomberg knew that these investors were asking Bloomberg reclassify Recovery Bonds because it would allow them to purchase more bonds at a higher rate of return. Bloomberg knew that these bonds were properly classified as corporate bonds and that an asset-backed classification of these bonds would be incorrect. Bloomberg also knew that if it acceded to its large customers' requests to make the change, it would result in higher monthly charges to millions of electricity customers. And Bloomberg knew that the only proper response to these requests was to reject them.

## VII.    **SCE's Recovery Bonds**

82.     To finance certain costs and expenses related to catastrophic wildfires, including fire risk mitigation capital expenditures, SCE (through wholly owned subsidiaries) issued Recovery Bonds. One wholly owned subsidiary SCE Recovery Funding LLC issued three series of Recovery Bonds: Series 2021-A ($337,783,000), 2022-A ($533,265,000), and 2023-A ($775,419,000).[12]

---

[12] SCE Recovery Funding LLC, https://www.edison.com/investors/financial-reports-information/debt-preferred-information/securitizations.

83.    To service these bonds, SCE collects and will continue to collect, recovery charges on its customers' (including Plaintiff Skolarus') monthly electricity bills, which payments are remitted to the bond trustee who will service bond principal and interest payments for the benefit of bondholders.[13]

84.    Two of the SCE Recovery Bonds series discussed above (Series 2021-A and 2022-A) were issued before Bloomberg's tortious actions began (and are not at issue in this lawsuit) and one (Series 2023-A) was issued *after* Bloomberg's tortious actions and is at issue in this lawsuit.

85.    Before 2022, Bloomberg indexed all Recovery Bonds, including the first two series of SCE's Recovery Bonds discussed above, as corporate bonds. With respect to the first two series of the SCE Recovery Bonds discussed above, they were priced only slightly higher than other contemporaneous comparable corporate bonds.

86.    SCE's Senior Secured Recovery Bonds, Series 2023-A, by contrast (issued *after* Bloomberg's tortious conduct), were priced at a significantly higher spread (i.e., above other contemporaneous comparable corporate bonds) than the two prior SCE Recovery Bond issuances issued before Bloomberg's tortious conduct began.

87.    By their terms, all three series of the SCE Recovery Bonds, including the third series (the one at issue here), will be paid off by SCE electricity customers and future customers through their monthly contractual payments to SCE.

88.    All of the SCE Recovery Bonds described above, including the 2023 series at issue in this case, were labeled, marketed, and sold as corporate bonds by the issuer (a subsidiary

---

[13] Moody's Investment Service, Second Party Opinion – SCE Recovery Funding LLC's Series 2023-A Assigned SQS2 Sustainability Quality Score, at https://s3.amazonaws.com/cms.ipressroom.com/406/files/202304/20230412-spo-series-2023a.pdf.

of SCE), its parent SCE, and underwriters. The prospectus for each series explicitly states: "Neither we nor the depositor is an asset-backed issuer and ***the bonds are not asset-backed securities*** as such terms are defined by the SEC in governing regulations Item 1101 of Regulation AB." (emphasis added).[14]

89.     All of the SCE Recovery Bonds described above, including the 2023 series at issue in this case, have a true-up mechanism that, when combined with the state's pledge of non-interference with the bondholder's right to be paid, effectively eliminates (for all practical purposes) any risk of default by making current and future electricity customers jointly and severally liable for the payments – if a customer does not pay and/or moves out of the jurisdiction, existing and future customers will be apportioned and charged the unpaid amounts until full payment is made.[15]

## VIII.    PG&E's Recovery Bonds

90.     PG&E sold Recovery Bonds to recover the costs expended to repair and replace equipment damaged by the 2017 California wildfires.

91.     PG&E formed two wholly owned subsidiaries that each issued two series of Recovery Bonds, four in total, to recover the costs expended to repair and replace equipment damaged by California wildfires. One wholly owned subsidiary is PG&E Recovery Funding LLC. That subsidiary issued $860 million of Recovery Bonds in May 2021 (the Series 2021-A Recovery Bonds) and another issuance of $983 million in November 2022 (the Series 2022-A Recovery Bonds, at issue in this action). The other wholly owned subsidiary is PG&E Wildfire

---

[14] ($775,419,000 Senior Secured Recovery Bonds, Series 2023-A, Prospectus, p. 5, at https://s3.amazonaws.com/cms.ipressroom.com/406/files/202305/series-2023a-prospectus-final.pdf.

[15] $775,419,000 Senior Secured Recovery Bonds, Series 2023-A, Prospectus, pp. 44, 56, at https://s3.amazonaws.com/cms.ipressroom.com/406/files/202305/series-2023a-prospectus-final.pdf.

Recovery Fund LLC. That subsidiary issued $3.6 billion of Recovery Bonds in May 2022 (the Series 2022-A Rate Neutral Recovery Bonds) and a second issuance of $3.9 billion of Recovery Bonds in July 2022 (the Series 2022-B Rate Neutral Recovery Bonds). In all, these four series of PG&E Recovery Bonds totaled over $9.3 billion.

92.     The Series 2021-A Recovery Bonds and the Series 2022-A Rate Neutral Recovery Bonds were issued before Bloomberg's tortious conduct alleged herein began. The Series 2022-A Recovery Bonds and the Series 2022-B Rate Neutral Recovery Bonds were issued *after* Bloomberg's tortious conduct began.

93.     To service all of the above-described PG&E Recovery Bonds, PG&E collects and will continue to collect, recovery charges on its customers' (including Plaintiff Small's) monthly electricity bills, which payments are remitted to the bond trustee who will service bond principal and interest payments for the benefit of bondholders.

94.     So long as PG&E is providing electricity (which it is required to do), by their terms, the PG&E Recovery Bonds will be paid off by PG&E electricity consumers and future customers through their monthly contractual payments to PG&E. That is true of both bonds issued by PG&E Recovery Funding LLC (the Series 2021-A Recovery Bonds and the Series 2022-A Recovery Bonds).

95.     The two bonds issued by PG&E Wildfire Recovery Funding LLC (the Series 2022-A Rate Neutral Recovery Bonds and the Series 2022-B Rate Neutral Recovery Bonds) are likewise billed to and paid by PG&E electricity consumers, however there is a customer credit trust, funded by PG&E, from which a dollar-for-dollar offsetting credit (i.e., offsetting the charges for these two particular bonds only) is applied to the customer's monthly bills, making

these two particular PG&E bonds essentially cost-neutral to PG&E customers. These bonds are not at issue in this case.

96.     The PG&E Recovery Bonds at issue in this case are the PG&E Senior Secured Recovery Bonds, Series 2022-A (Nov. 2022 $983 million), which were issued after Bloomberg's tortious conduct began and did not have any offsetting bill credit.

97.     All four series of PG&E Recovery Bonds described above (including the PG&E Recovery Bonds at issue in this case) were labeled, marketed, and sold as corporate bonds by the issuer (a subsidiary of PG&E), its parent PG&E, and underwriters.

98.     All four series of the PG&E Recovery Bonds described above (including the PG&E Recovery Bonds at issue in this case) have a true-up mechanism that, when combined with the state's pledge of non-interference with the bondholder's right to be paid, effectively eliminates, for all practical purposes, any risk of default by making current and future electricity consumers jointly and severally liable for the payments – if a customer does not pay and/or moves out of the jurisdiction, existing and future consumers will be apportioned and charged the unpaid amounts until full payment is made.[16]

99.     PG&E's $3.9 billion Recovery Bond issued in July 2022 and PG&E's $983 million Recovery Bond issued in November 2022—both of which were issued *after* Bloomberg's tortious conduct began (the latter being at issue in this lawsuit)—were priced at significantly higher spreads (i.e., above other contemporaneous comparable corporate bonds) than the two prior PG&E Recovery Bond issuances, issued before Bloomberg's tortious conduct began (including the May 2022 PG&E issuance which happened just a few months before the July 2022 PG&E issuance).

---

[16] PG&E Series 2022-A Recovery Bonds Prospectus (issued November 2022), pp. 4-11 (Summary of Terms).

IX.    **ERCOT's Recovery Bonds**

100.    In February 2021, Winter Storm Uri resulted in outages at many of the generation resources within the ERCOT power region, and the demand for power exceeded supply for several days during the week of the storm. This condition drove up prices in the wholesale electricity market resulting in great financial burdens to both market participants and the ultimate electric customers. As a result of these market conditions, ERCOT was unable to collect sufficient funds to fully pay certain wholesale-market participants who were due payments from ERCOT for power they produced into the ERCOT System during the storm. In response to the impact of Winter Storm Uri on the ERCOT power region, the Legislature authorized the issuance of $2.1 billion in Recovery Bonds to reimburse ERCOT electricity providers and to benefit retail electricity customers who may have otherwise been invoiced for those extraordinary costs.[17]

101.    To service these bonds, ERCOT and/or the downstream retail electricity providers in the ERCOT system have collected and will continue to collect recovery charges on its customers' (including Plaintiff Tortolani's) monthly electricity bills, which payments are remitted to the bond trustee who will service bond principal and interest payments for the benefit of bondholders.

102.    ERCOT's 2022 Recovery Bonds were priced at significantly higher spreads (i.e., above other contemporaneous comparable corporate bonds) than any prior Recovery Bond issuance. By the time the 2022 ERCOT Recovery Bonds were issued, Bloomberg had already publicly announced that it was "re-evaluating" whether to classify Recovery Bonds as corporate bonds or asset-backed securities (i.e., after the request for the change came in from Bloomberg's

---

[17] $2,115,700,000 Texas Stabilization Subchapter N Bonds, Series 2022 Offering Memo, pp. 3-4, https://www.ercot.com/files/docs/2022/06/17/Offering%20Memorandum.pdf.

large investor customers), which sent a clear message to the market that Bloomberg would be reclassifying them as asset-backed.

103.    ERCOT is one of the nation's largest electric utilities, responsible for managing the flow of electric power to more than 26 million Texas customers. As the Independent System Operator for the ERCOT power region, ERCOT schedules power on an electric grid that connects more than 52,700 miles of transmission lines and over 1,030 generation units. Electricity within the ERCOT system is ultimately delivered to consumers by downstream retail electricity providers that obtain the electricity from ERCOT via "scheduling entities."

104.    So long as ERCOT is providing electricity (which it is required to do), by their terms, the ERCOT Recovery Bonds at issue in this case will be paid off by current and future ERCOT-system customers through their monthly contractual payments.

105.    The ERCOT Recovery Bonds were labeled, marketed, and sold as corporate bonds by the issuer (a subsidiary of ERCOT), its parent ERCOT, and underwriters. The Offering Memorandum for each series explicitly states: "Neither we nor ERCOT is an asset-backed issuer and *the Bonds are not asset-backed securities* as such terms are defined by the SEC in governing regulations Item 1101 of Regulation AB."[18]

106.    The ERCOT Recovery Bonds have a true-up mechanism that, when combined with the state's pledge of non-interference with the bondholder's right to be paid, effectively eliminates any risk of default by making current and future electricity customers jointly and severally liable for the payments – if a customer does not pay and/or moves out of the

---

[18]    $2,115,700,000 Texas Stabilization Subchapter N Bonds, Series 2022 Offering Memo, pp. 17, 58 https://www.ercot.com/files/docs/2022/06/17/Offering%20Memorandum.pdf (emphasis added),

jurisdiction, existing and future consumers will be apportioned and charged the unpaid amounts until full payment is made.[19]

X.    **Corporate Bonds**

107.    "A bond is a debt obligation, like an IOU. Investors who buy corporate bonds are lending money to the company issuing the bond. In return, the company makes a legal commitment to pay interest on the principal and, in most cases, to return the principal when the bond comes due or matures." https://www.sec.gov/files/ib_corporatebonds.pdf. "Companies use the proceeds from bond sales for a wide variety of purposes, including buying new equipment … [and] refinancing debt…." https://www.sec.gov/files/ib_corporatebonds.pdf.

108.    "Corporate bonds make up one of the largest components of the U.S. bond market, which is considered the largest securities market in the world." https://www.sec.gov/files/ib_corporatebonds.pdf. The U.S. corporate bond market is over $10 trillion according to SIFMA. In contrast, the asset-backed securities market is about one-tenth that size. Further, the trading volume in corporate bonds is substantially greater than that of asset-backed securities. The corporate bond index is competitive and liquid. It has more bonds, money, investors, issuers, and transactions, than the asset-backed securities index.

109.    Bloomberg knew that changing Recovery Bonds' classification from corporate bonds to asset-backed securities, as it did in 2022, would significantly limit the universe of potential buyers (including, because a far smaller universe of investors can invest in asset-backed securities, and there is a much less extensive secondary market for asset-backed securities) and thus limit competition, decrease liquidity, and increase the interest rates for these bonds,

---

[19] $2,115,700,000 Texas Stabilization Subchapter N Bonds, Series 2022 Offering Memo, pp. 44-45, 103-04, https://www.ercot.com/files/docs/2022/06/17/Offering%20Memorandum.pdf.

resulting in higher investment returns for the investors and higher monthly recovery bond repayment charges for the electricity customers.

110.    Before formally announcing its reclassification, Bloomberg was reminded of these effects. After its large investor customers requested that Bloomberg reclassify Recovery Bonds as asset-backed securities, Bloomberg solicited input from institutional investors, ostensibly for the purpose of helping guide Bloomberg's decision as to whether to reclassify. Some of the respondents explicitly noted to Bloomberg that reclassifying Recovery Bonds as asset-backed securities would significantly limit the pool of investors who could purchase these bonds.

## XI.    Asset-Backed Securities (ABS)

111.    In contrast to corporate bonds, ABS are created by buying and bundling loans – such as residential mortgage loans, commercial loans, or student loans – and creating securities backed by those assets, which are then sold to investors. Often, a bundle of loans is divided into separate securities ("tranches") with different levels of risk and returns. https://www.sec.gov/spotlight/dodd-frank/assetbackedsecurities.shtml; *see also* 15 U.S.C. § 78c(a)(79) ("The term "asset-backed security"— (A) means a fixed-income or other security collateralized by any type of self-liquidating financial asset (including a loan, a lease, a mortgage, or a secured or unsecured receivable) that allows the holder of the security to receive payments that depend primarily on cash flow from the asset…").

112.    Payment on an ABS depends primarily on the cash flows generated by the assets in the underlying pool and other rights designed to ensure timely payment, such as excess spread, subordination, over-collateralization, liquidity facilities, guarantees or other features generally known as credit enhancements. ABS and ABS issuers differ from corporate securities and operating companies. In offering ABS, there is generally no business or management to describe.

The issuer is simply a pass-through. *See*
https://www.federalregister.gov/documents/2005/01/07/05-53/asset-backed-securities#citation-27-p1507.[20]

## XII.    Recovery Bonds Are Corporate Bonds, Not ABS

113.    Recovery Bonds' prospectuses typically expressly state that they are "not" ABS and that the issuers are "not" asset-backed issuers, which is accurate for all Recovery Bonds (including all the Recovery Bonds at issue here), whether or not this explicit statement is in the corresponding prospectus (it is for the Recovery Bonds at issue here).

114.    Issuers and underwriters are obligated to speak truthfully in prospectuses – i.e., not say anything materially false or misleading. On information and belief, the SEC has never taken action or initiated any inquiry against Recovery Bond issuers or underwriters for saying Recovery Bonds are "not" asset-backed and the issues thereof are "not" asset-backed issuers.

115.    Recovery Bonds are fundamentally different from ABS.

116.    ABS are individual, private, loan contracts (for mortgages, autos, etc.) bundled together to create securities.

117.    The underlying loan contract rights supporting ABS are tangible property rights, that is, financial assets that can be sold. ABS' underlying contractual rights are accounts receivable pooled together that have attached legal rights allowing them to be sold and securitized.

---

[20] Under Regulation AB, the basic definition of "asset-backed security" is "a security that is primarily serviced by the cash flows of a discrete pool of receivables or other financial assets, either fixed or revolving, that by their terms convert into cash within a finite time period, plus any rights or other assets designed to assure the servicing or timely distributions of proceeds to the securityholders…" https://www.federalregister.gov/documents/2005/01/07/05-53/asset-backed-securities#citation-27-p1507.

118.    Because some individual borrowers on the loans can (and do) default, ABS are issued with provisions to account for the credit risk, such as:

a.    Excess spread;

b.    Over collateralization – that is, providing collateral that is worth more than the amount of the loan;

c.    Credit tiering (senior/subordinated "tranching") – that is, dividing the pool of loans into lower-risk (less likely to default, paying a lower interest rate) and higher risk (more likely to default, paying a higher interest rate); and/or

d.    Third party guarantees.

119.    Recovery Bonds, in contrast, are issued pursuant to ***legislative enactments*** that give the utility the right to bill and collect certain amounts (expended in furtherance of the utilities' electrical business) from electricity customers in the utilities' service territory, and the state government pledges never to interfere with the ability to bill and collect these charges. The utility enjoys a guarantee that it will be able to charge its electricity customers to fully service these bonds.

120.    Recovery bonds are secured by intangible property rights authorizing the utility to bill electricity customers (current and future) for the amounts needed to service these bonds, so long as the utility provides electricity, all but a certainty for SCE, PG&E, and ERCOT, which all enjoy a monopoly or quasi-monopoly in providing consumer electricity service in their respective territories/systems.

121.    Unlike ABS, Recovery Bonds are issued without over-collateralization or credit tiering ("tranching") because there is virtually no risk of non-payment. There are no financial assets in the subsidiary, no receivables or other characteristics of ABS to default, but rather a

legislative mandate and a true-up mechanism effectively making the electricity customers jointly and severally liable for the bond payments (if one customer does not pay, that amount is "trued-up" and apportioned to the remaining customers until it is paid). The risk of PG&E, SCE and ERCOT ceasing electrical service in their respective regions is close to zero.

122.    The Recovery Bonds' series trust structure further disqualifies the utilities from being an asset-backed issuer and the bonds from being properly classified as asset-backed securities under the law. Sections 1101(b) and (c) of Regulation AB. As allowed by the Wildfire Financing Law and stated in the prospectus for the PG&E Recovery Bonds, for example: "The issuing entity may issue additional recovery bonds…secured by additional recovery property…." ($3.9B Senior Secured Recovery Bonds, Series 2022-B, PG&E Wildfire Recovery Bonds Prospectus, p. 4). One entity issuing two sets of bonds, and that can issue more bonds, is consistent with corporate bonds and inconsistent with ABS classification. SEC Release No. 33-8518 states that securities issued by entities that are organized as "series trusts" with flexibility to issue additional securities in wholly separate and unrelated transactions will not be "asset-backed securities" for purposes of Regulation AB. https://www.sec.gov/files/rules/final/33-8518.pdf.

123.    The SEC agrees that Recovery Bonds are not ABS. In 2007, the SEC issued a "no action" letter and legal interpretation confirming this position. *See* https://www.sec.gov/divisions/corpfin/cf-noaction/2007/mpef091907-1101.htm and the incoming letter describing the bonds https://www.sec.gov/divisions/corpfin/cf-noaction/2007/mpef090707-1101-incoming.pdf.

124.    ABS are generally bundles of past loan transactions – e.g, specific individuals who already borrowed money and promised to repay (for mortgages, autos, etc.) under signed contracts, whereas Recovery Bonds do not have this characteristic.

125.    ABS and Recovery Bonds also fundamentally differ in how the bond payments are made. ABS are based on underwritten individuals' abilities to repay money they borrowed under individually, agreed-upon loan contracts that are bundled together. ABS can underperform if the individual borrowers are unable to repay the loans.

126.    Recovery Bonds, in contrast, are based on statutory edicts authorizing utilities to bill and collect amounts from the customers in the utilities' territories/system for up to 20 years or more. The electricity customers are effectively jointly and severally liable for the bond payments, e.g., if people move away or otherwise don't pay, the remaining electricity customers will pay more until the bonds are fully repaid. Recovery Bonds involve no underwriting, no loan contracts, and virtually no risk of defaults or underperformance.

127.    Further, Recovery Bonds are paid off the same way that other (i.e., non-recovery) corporate bonds are paid off – customer revenue. The only way the Recovery Bonds at issue in this case will not be paid is if PG&E, SCE and ERCOT cease delivering electricity to customers in their territories/system.

128.    For ABS, the individuals who borrowed money (mortgages, autos, etc.) pay from wherever they reside; there is no territorial restriction.

129.    Recovery Bonds, in contrast, are territorially defined by the utilities' boundaries. Recovery Bonds are paid by virtually everyone within the utilities' boundaries/system (i.e., everyone that receives electricity from the utility with limited exceptions) until the bonds are ultimately paid off.

130.    ABS are based on identified individuals' past loan transactions – known people who borrowed and will pay known amounts (for mortgages, autos, etc.), whose credit is known

(through underwriting), and whose ability to pay back underlies the bonds' ratings (AAA, AA, etc.).

131.    Recovery Bonds, on the other hand, will be paid by people who are (at least partially) unknown at the time they are issued. Payments will be made by current and future electricity customers over the approximate 20-plus year life of the bonds through their monthly contractual payments to their utilities; people who leave the utility's territory/system will stop paying and people who move in will start paying.

**XIII.    The SEC, FASB, FINRA And EU All Agree Recovery Bonds Are Corporate Bonds.**

      **A.    SEC**

132.    The SEC recognizes that Recovery Bonds are corporate bonds and not ABS. The SEC is the independent federal agency created by Congress in 1934 to enforce the laws against market manipulation, protect investors, maintain fair and orderly functioning of the securities market, and facilitate capital formation. The SEC sets forth reporting standards and regulations for public companies.

133.    In 2007, the SEC issued a "no-action letter" and interpretation that a Recovery Bond (using the same series trust structure as used by the Recovery Bonds at issue here) was not an ABS. *See* https://www.sec.gov/divisions/corpfin/cf-noaction/2007/mpef091907-1101.htm ("the Bonds are not asset-backed securities within the meaning of Item 1101 of Regulation AB") and incoming letter https://www.sec.gov/divisions/corpfin/cf-noaction/2007/mpef090707-1101-incoming.pdf.

      **B.    FASB**

134.    The Financial Accounting Standards Board (FASB), formed in 1973, is a private independent nonprofit standard-setting body whose primary purpose is to establish and improve Generally Accepted Accounting Principles (GAAP) within the United States in the public's

interest. FASB establishes accounting and financial reporting standards for public and private companies and nonprofit organizations in the United States, enabling investors and analysts to better compare the financial statements of multiple companies within a common sector or industry. "FASB's mission is to create and improve financial accounting practices for credible and accurate information to investors and other users. Also, it is mandated to educate stakeholders on how to comprehend and implement accounting standards effectively."[21]

135.    The SEC recognizes FASB as the accounting standard-setter for public companies.

136.    FASB issues Statements designed to set standard sound accounting principles. Both the SEC and FASB also issue staff guidance to help implement the standards. FASB and SEC guidance statements are in harmony on the point that Recovery Bonds are not ABS.

137.    FASB Statement 125 provides accounting and reporting standards for transfers and servicing of financial assets and extinguishment of liabilities. FASB's guide to interpretation of Statement 125 provides that Recovery Bonds are distinguishable from ABS because Recovery Bonds "are not financial assets [of the type that would support ABS] because they are imposed on ratepayers by a state government or its regulatory commission and, thus…not a financial asset [of the type that would support an ABS]."[22]

---

[21] Accounting Standard (Corporate Finance Institute 12/7/22) https://corporatefinanceinstitute.com/resources/accounting/accounting-standard/.

[22] FASB, Q&A 125—A Guide to Implementation of Statement 125 on Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities: Questions and Answers (Third Edition 10/99), available at https://dart.deloitte.com/USDART/pdf/2728724e-3f34-11e6-95db-538fd992e5a8. FASB Statement 140 (Amended 2010) superseded Statement 125, but is consistent in distinguishing ABS from Recovery Bonds, *see* FASB Statement of Accounting Standard No. 140 (2010), App. A, ¶73, available at https://fasb.org/Page/ShowPdf?path=aop_fas140.pdf&title=FAS+140+%28AS+AMENDED%29&acceptedDisclaimer=true&Submit=.

C.    **FINRA**

138.    "The Financial Industry Regulatory Authority (FINRA) is an independent, nongovernmental organization that writes and enforces the rules governing registered brokers and broker-dealer firms in the United States. Its stated mission is 'to safeguard the investing public against fraud and bad practices.'"[23]

139.    "FINRA is authorized by Congress to protect America's investors by making sure the broker-dealer industry operates fairly and honestly. [FINRA] oversee[s] more than 624,000 brokers across the country—and analyze[s] billions of daily market events." FINRA is dedicated to protecting investors and safeguarding market integrity in a manner that facilitates vibrant capital markets, to ensure that everyone can participate in the market with confidence, and that every securities product advertisement used is "truthful, and not misleading."[24]

140.    FINRA's TRACE system provides real-time market information. FINRA's TRACE system lists Recovery Bonds as corporate bonds.

141.    Further, FINRA has taken no action against the underwriters and brokers who assist in authoring Recovery Bond prospectuses (which as described above routinely explicitly state that the bonds are not ABS) and in marketing and selling Recovery Bonds as corporate bonds.

D.    **The EU**

142.    The EU is an international organization comprising 27 European countries and governing common economic, social, and security policies.

---

[23] L. Manning, Financial Industry Regulatory Authority (FINRA) Definition (Investopedia 6/11/22), available at https://www.investopedia.com/terms/f/finra.asp.

[24] FINRA, About FINRA, available at https://www.finra.org/about.

143.    Like the SEC, the EU does not consider Recovery Bonds "asset-backed securities" (US) or "securitisations" (the EU terminology for ABS).

144.    Notably, PG&E itself, the issuing entity for the PG&E Recovery Bonds at issue in this case, and its underwriters all agreed that the PG&E Recovery Bonds are not ABS Bonds or securitisations. As explained in a 2022 Prospectus for PG&E's Recovery Bonds: "The issuing entity and PG&E do not believe that the recovery bonds fall within the definition of a "securitisation" for purposes of the EU Securitization Regulation or the UK Securitization Regulation as there is no tranching of credit risk associated with exposures under the transactions described in this prospectus. Therefore, the issuing entity and PG&E believe such transactions are not subject to the European Securitization Rules or the UK Securitization Rules." ($3.9B Senior Secured Recovery Bonds, Series 2022-B, PG&E Wildfire Recovery Bonds Prospectus, p. 48).

## XIV.    Other Financial Institutions Agree Recovery Bonds Are Corporate Bonds.

145.    Other financial institutions likewise agree that Recovery Bonds are corporate bonds. For example, the Duke Energy Florida Project Finance LLC bonds were classified as "corporate/ utility" bonds by Citi and Merrill Lynch/Bank of America Fixed Income Index.

146.    Vanguard likewise agrees that Recovery Bonds are corporate bonds - it recently bought Recovery Bonds and listed them in its holdings as corporate bonds. Vanguard's Semi-Annual Bond Fund Reports lists Recovery Bonds – including PG&E's May 2022 Recovery Bonds - as "Corporate – Utility" bonds, not ABS. (8/31/22 Annual Report of Vanguard Corporate Bond Index Funds, pp. 55, 89).[25]

---

[25] In 2023, Vanguard continued to list PG&E's May 2022 Recovery Bonds - as "Corporate – Utility" bonds, not ABS. (2/28/23 Semiannual Report of Vanguard Corporate Bond Index Funds, p. 52).

147.    And before Bloomberg acquired it in 2016, Barclay's fixed income indexes (the dominant benchmarks in the bond market at the time) likewise classified Recovery Bonds as corporate bonds.

## XV.    From 2016 To Mid-2022, Bloomberg Itself Agreed That Recovery Bonds Are Corporate Bonds.

148.    From the time it purchased the Barclays indexes in 2016, until mid-2022, Bloomberg consistently classified Recovery Bonds as corporate bonds. For example, every year (at year-end, annual index reviews from 2016 through 2021), Bloomberg confirmed that Duke Energy Florida Project Finance Recovery Bonds were corporate bonds and included them in its corporate/utilities index.

149.    Whenever new Recovery Bonds were issued during the 2016 to mid-2022 time period, Bloomberg classified them as corporate bonds. For example, in 2021, two Recovery Bonds were issued – a PG&E $400 million Recovery Bond and a Duke Energy $350 million Recovery Bond. Bloomberg classified both as corporate bonds.

150.    And in the first half of 2022, more Recovery Bonds were issued and Bloomberg classified them, too, as corporate bonds. Specifically, in February 2022, SCE issued $700 million in Recovery Bonds and Bloomberg classified them as corporate bonds.

151.    In February 2022, another $200 million Recovery Bond was issued and Bloomberg again classified it as a corporate bond. In May 2022, PG&E issued almost $3.5 billion in new Recovery Bonds and Bloomberg classified all of those bonds as corporate bonds.

152.    Thus, including both initial classifications and annual reviews, Bloomberg consistently classified Recovery Bonds as corporate bonds between 2016 and mid-2022.

**XVI.  Bloomberg's Own Data Group Still Confirms That Recovery Bonds Are Corporate Bonds.**

153.    Bloomberg's data group reviews almost every bond issued and decides how to classify them.

154.    Like Bloomberg's index group, Bloomberg's data group consistently classified Recovery Bonds as corporate bonds from 2016 to mid-2022. Unlike Bloomberg's index group, however, its data group never reclassified Recovery Bonds as ABS.

155.    On Bloomberg's terminal, Recovery Bonds continue to be classified as corporate bonds, including all of the SCE, PG&E, and TX ERCOT Recovery Bonds at issue in this case. For example, the $983 million PG&E Recovery Bond issued November 2022, after Bloomberg index group's reclassification, appears in Bloomberg's data terminal as a corporate bond with a "CORP" ticker symbol.

**XVII.  Bloomberg's Mid-Year 2022 "Review" And Reversal Violates The Law, Recognized Standards And Bloomberg's Own Policies And Practices.**

**A.    Bloomberg's June 8, 2022 Announcement**

156.    During a six-week period in June and July 2022, two Recovery Bonds were set to be issued totaling $6 billion – more than what had been issued between 2016-2021 combined.

157.    Starting in early June 2022, Bloomberg made multiple announcements pertinent to this case.

158.    Bloomberg's first such announcement was made just days before the $2.1 billion ERCOT Recovery Bond was priced and issued.

159.    On June 8, 2022, Bloomberg announced a highly unusual mid-year "review" regarding Recovery Bonds – which Bloomberg described as a "review of the classification of

recovery bonds and their treatment with regards to their membership in the corporate vs ABS index."[26]

160.    Bloomberg's Methodology sets forth five potential reasons for conducting a mid-year "review" and/or changing a bond's index classification. Two reasons are "extreme market events and/or material changes to the applicable underlying market interests…." (Methodology, p. 105). In the case of Recovery Bonds in 2022, there were no qualifying "extreme market events" or "material changes." In fact, Bloomberg did not say or suggest, in its June 8, 2022 announcement or at any time, that there were any such "extreme" events or "material changes."

161.    The remaining three potential reasons, in Bloomberg's Methodology, for conducting a mid-year "review" and/or changing a bond's indexing classification, are corporate, government, or business changes.[27] None of those reasons occurred/applied with respect to Recovery Bonds in 2022. Nor did Bloomberg identify any of these as an impetus for its 2022 mid-year "review" or its ultimate decision to reclassify Recovery Bonds at that time.

162.    In short, none of the five stated reasons in Bloomberg's own Methodology for a mid-year review or classification change were present when Bloomberg announced in mid-2022 that it was reviewing the classification of Recovery Bonds. Instead, Bloomberg's stated reason for this mid-year "review" was a purported conflict between the Recovery Bonds' "language" (saying they are "not asset-backed securities") and "structure" (saying they are "not guaranteed by the Corp parent (e.g., PG&E)").

---

[26] Bloomberg, Index Announcement, available at https://saberpartners.com/wp-content/uploads/2023/01/Bloomberg-BISL-Recovery-Bond-Reclassification-Index-Announcements-June-July-August-2022.pdf.

[27] Bloomberg says a bond's "[s]ector classification can change due to various factors: Corporate Actions…such as merger, acquisition, or spin-off…Change in Government Ownership…may result from a decrease or increase in a government's ownership stake…Evolution of Business Lines… If the business lines of a corporate entity shift, it could be reclassified to reflect its new peer group." (Methodology, pp. 20-21).

163.    There was no such conflict and no legitimate reason for the "review" at all, let

alone a sudden, mid-year review.

164.    Bloomberg's June 8 Announcement stated:

> The Bloomberg Index team is opening a formal review of the classification of recovery bonds and their treatment with regards to their membership in the corporate vs ABS index.
>
> Since February 2021, a number of deals containing recovery bonds have been issued. These bonds are currently classified as Corporate on the Bloomberg terminal and in the fixed income indices. These deals were brought to the market by the underwriters as corporate deals. There is language in some of the deal documentation along the lines of
>
> 'Neither the issuing entity nor the depositor is an asset-backed issuer and the recovery bonds are not asset-backed securities as such terms are defined by the SEC in governing regulations Item 1101 of Regulation AB.'
>
> The structure of these deals allows that investors have no recourse to the Corp parent in the event of default. They are not guaranteed by the Corp parent (eg:PG&E) but are backed by the recovery property.
>
> In light of the above, the Bloomberg index team is formally opening its index governance review of the Classification of these bonds as corporate vs ABS.

(June 8, 2022 Bloomberg Fixed Income Indices Index Announcement "Recovery Bonds

Classification Consultation: Corp vs ABS").

165.    The purported conflict between the Recovery Bonds' "language" and "structure"

was (and is) non-existent. The "language" mentioned in Bloomberg's announcement simply

says, correctly, that Recovery Bonds are not ABS. The "structure" mentioned – no parent

guarantee – is not what differentiates corporate bonds from ABS. Corporate bonds are not

defined by the presence or absence of a parent guarantee. There are corporate bonds with and

without a parent's guarantee. Indeed, the absence of a parent's guarantee was consistently true

for Recovery Bonds before Bloomberg's mid-2022 "review" (i.e., for years). For example, PG&E issued approximately $3.5 billion in Recovery Bonds the month before with no parent guarantee.

166.    There was nothing new warranting a sudden, mid-year "review" or index reclassification. Both the "language" and "structure" of Recovery Bonds had remained materially the same for years.

167.    Bloomberg's stated reason for the mid-year "review" was pretextual, negligent, reckless, and/or knowingly false when made. On information and belief, the real reason for the "review" was that Bloomberg institutional investor customers – including some of Bloomberg's largest customers – asked Bloomberg to re-classify Recovery Bonds – to take them out of the corporate index and put them into the ABS index - so those customers would earn hundreds of millions of dollars more in interest.

168.    Caving to requests from these investor customers, Bloomberg initiated a pretextual "review" process and negligently or fraudulently reclassified Recovery Bonds as ABS.

169.    In addition to violating its own substantive policies, Bloomberg's "review" violated Bloomberg's own procedural policies and practices as well. When deciding whether to change a bond's classification or make other changes to its indexes, Bloomberg says it "will set forth the rationale for any proposed changes as well as the timeframe and process for responses…[and] affected stakeholders [] input will be solicited." (Methodology, p. 105). Bloomberg did none of these things with respect to the reclassification at issue in this case.

170.    Bloomberg did not "set forth the rationale for any proposed changes" – the purported "conflict" between "language" and "structure" was not a rationale (no such conflict

existed) and the language and structure of Recovery Bonds had remained effectively unchanged for some 15 years.

      171.    Nor did Bloomberg set forth a "timeframe" for responses. The June 8 Announcement omitted mention of any such timeframe, saying only:

> Please forward your feedback on the above along with any
> additional suggestions or thoughts to your regional index team or
> email indexhelp@bloomberg.net. This feedback will be considered
> by Bloomberg's internal index governance committee, and
> Bloomberg will decide unilaterally whether, and how, to respond
> to any feedback, comment, or recommendation that results from
> the review process. A formal announcement regarding the outcome
> of the governance review will be made at the conclusion of the
> process.

      172.    Bloomberg's announcement never said when responses were due or when Bloomberg would decide. Nor did Bloomberg ever provide that information before it announced the reclassification formally on August 1, 2022.

      173.    Nor did Bloomberg "solicit" input from affected stakeholders, other than certain institutional investors. Its process was inconsistent with best practices, IOSCO Principles, and the "code of ethics to prevent conflicts of interest from inappropriately influencing index construction…including the use of expert judgment." (Methodology, p. 107; Nov. 6, 2015 Bloomberg Article https://www.bloomberg.com/company/press/bloomberg-confirms-alignment-of-key-indices-with-the-international-organization-of-securities-commissions-iosco-principles-for-financial-benchmarks/)).

      174.    Moreover, on information and belief, Bloomberg's announcements about its mid-year "review" appeared only on the Bloomberg Terminal (which requires a subscription at approximately $25,000/year). The announcements did not appear in any publicly accessible forum, including on Bloomberg's website www.Bloomberg.com. Thus, only those with a Bloomberg Terminal had access to the announcements.

175.    Bloomberg issued no press release or other public announcement. Bloomberg knows (and can readily ascertain) the identities of Recovery Bond issuers and their financial consultants and could have solicited input from them on the subject but did not do so because those entities were likely to support maintaining the corporate bond classification.

176.    Bloomberg's June 8, 2022 announcement identified particular Recovery Bonds – six utilities, six regulators, in six states. On information and belief, Bloomberg "solicited" input from none of them (other than the general announcement(s) made through its Bloomberg Terminal). In short, Bloomberg solicited input from one side (its largest customers who planned to purchase Recovery Bonds and asked Bloomberg to change to an ABS classification so they could receive higher interest returns) and did not solicit input from others who would meet Bloomberg's own definition of stakeholders.

177.    Bloomberg had a conflict of interest. Bloomberg violated the law (including without limitation the EU's BMR that governs BISL's conduct), its own policies, IOSCO Principles, and best practices because it did not solicit input from "stakeholders" likely to oppose reclassification. The "review" was a sham and the reclassification a fait accompli. Through the sham "review" process, Bloomberg proceeded to "stack the deck" on stakeholders' responses and use that as a pretense to justify, conceal, and obfuscate its misconduct.

**B.    Bloomberg's July 7, 2022 Announcement**

178.    Bloomberg's second announcement was made just weeks before the $3.9 billion PG&E Recovery Bond (which is not part of this case) was priced and issued.

179.    On July 7, 2022, Bloomberg released a second announcement entitled "Index Technical Note" "Recovery Bonds Classification Consultation Update." This second announcement had the same defects, and false pretext, as the prior (June 8, 2022) announcement and also had additional defects.

180.     The July announcement stated:

On June 8, Bloomberg Index Services Limited (BISL) opened a formal review of the classification of recovery bonds *(otherwise known as "stranded cost"* or "rate reduction" *bonds)* and their classification with respect to BISL's corporate and ABS indices."

This consultation will not affect the initial classification of new recovery bonds that come to market while the consultation period[28] is ongoing; *such as the PG&E Wildfire Recovery deal issued on July 6, which will be classified as Corporate*. The classification of recovery bonds within the fixed income indices *remains under review and is subject to future changes* as BISL completes the consultation. (emphasis added).

181.     This second announcement mentioned PG&E (as did the June 2022 announcement) and PG&E's $3.9 billion Recovery Bond by name, which Bloomberg falsely stated had "issued on July 6." In fact, PG&E's $3.9 billion Recovery Bond had not yet issued at the time of Bloomberg's July 7, 2022 announcement. Nor had that bond been priced by that time. The prospectus for this PG&E Recovery Bond was dated July 13, 2022 and it was issued on July 20, 2022 – one and two weeks, respectively, after Bloomberg falsely said it had been issued. Bloomberg made its July 7, 2022 announcement to signal that Recovery Bonds would be classified as ABS with a higher perceived risk and to discourage investors who cannot invest in ABS from buying these bonds, and to thus increase the interest rate that would be set for this bond.

182.     Bloomberg's statement in the July 7, 2022 announcement regarding the issue date of the PG&E Recovery Bond was knowingly false.

183.     Bloomberg's July 7, 2022 announcement also violated Bloomberg's own long-standing policy of not commenting on a bond, or disclosing how it will be classified before it is

---

[28] In this announcement, Bloomberg mentioned a "consultation period" without saying what that period was (e.g., no timeframe, no deadline).

issued.[29] Bloomberg's announcement did both. The false information was never corrected, withdrawn, or explained by Bloomberg.

184.    Further, this second announcement attempted to re-characterize the process. The first (June 2022) announcement stated the Bloomberg index team was doing a "review" (alternatively calling it a "formal review" or a "governance review").  The second (July 2022) announcement characterized the process as a "consultation," reinforcing that the "stakeholders" with whom Bloomberg was consulting would be influencing the decision and reinforcing the signal that Bloomberg would be reclassifying Recovery Bonds as ABS.

185.    Moreover, the second announcement stated that Recovery Bonds were "known as 'stranded cost'" bonds – which garner high interest rates because of their risk.

186.    Neither the Recovery Bond issuers nor the Recovery Bonds themselves have anything in their structure or documentation that uses the terms "stranded costs."

187.    Bloomberg nevertheless publicly announced that Recovery Bonds were known as "stranded cost" ABS almost one month before Bloomberg's formal reclassification decision was announced, signaling that it had already decided to reclassify Recovery Bonds as ABS.

188.    Bloomberg's July 2022 statement that Recovery Bonds are known as "stranded cost" ABS was false and cast Recovery Bonds as a far riskier investment than they actually were and are.

189.    Recovery Bonds, including those at issue here, are in fact safer investments than ABS, in particular "stranded cost" ABS. There is nothing "stranded" about Recovery Bonds generally, or about the SCE, PG&E, or ERCOT Recovery Bonds at issue here specifically,

---

[29] *See* Bloomberg's Methodology, p. 21 n.25 ("Due to potential uncertainty and complications surrounding corporate actions, changes to classifications for index purposes take effect *after the close of transaction* rather than following the announcement.") (emphasis added).

particularly given the legislation authorizing the future billing and collection of certain sums for electrical service from the electricity customers.

      **C.**      **Bloomberg's Actions Caused Interest Rates to Increase on Recovery Bonds**

      190.     Bloomberg made the June and July 2022 announcements to send a clear signal to the market, in advance of the then-upcoming ERCOT and PG&E Recovery Bond issuances, that Bloomberg would be reclassifying Recovery Bonds as ABS. The timing of the announcements was intended to increase the interest rate on Recovery Bonds issued even before formal reclassification.

      191.     Bloomberg's June and July 2022 announcements had the intended effect of inflating the interest electricity customers paid. Before Bloomberg's announcements, Recovery Bonds were priced modestly higher than other comparable corporate bonds.

      192.     By contrast, just days after Bloomberg's June 8, 2022 announcement, the $2.1 billion 2022 ERCOT Recovery Bond—one of the Recovery Bonds at issue in this case—was issued and priced significantly higher than other contemporaneous comparable corporate bonds, at much larger spreads (i.e., above other contemporaneous comparable corporate bonds) than Recovery Bonds that proceeded Bloomberg's tortious conduct.

      193.     And within two weeks of Bloomberg's second (July 7, 2022) announcement, PG&E's $3.9 billion 2002 Recovery Bond (not at issue because it is cost-neutral to the customers)—was issued and priced significantly higher than other contemporaneous comparable corporate bonds, again at much larger spreads (i.e., above other contemporaneous comparable corporate bonds) than Recovery Bonds that proceeded Bloomberg's tortious conduct (including the Recovery Bonds issued by PG&E two months earlier in May 2022, and in May 2021). Bloomberg's June and July 2022 announcements signaled it was going to reclassify Recovery

Bonds as ABS, causing higher interest rates on a bond materially indistinguishable from recent Recovery Bond issuances from the exact same utility.

194.    Bloomberg's announcements will thus result in Recovery Bond buyers receiving – and millions of Texas electricity customers collectively paying – hundreds of millions of dollars more in interest over the life of the bonds. Before formally announcing it was reclassifying Recovery Bonds as ABS, and after it formalized its reclassification, Bloomberg was well aware of who would be harmed (millions of everyday consumers), and the magnitude of the harm they would suffer.

        D.    **<u>Bloomberg's August 1, 2022 Announcement.</u>**

195.    After signaling to the market in June and July 2022 that it would be making the reclassification, on August 1, 2022, Bloomberg formally announced that it was, in fact, "reclassify[ing]" Recovery Bonds as "stranded cost" ABS. Bloomberg's August 1st announcement said:

> Following the end of the consultation period, [***Bloomberg***] ***has decided*** these securities are ***better aligned with an ABS classification*** and will ***reclassify them to the ABS -> Stranded Cost*** category…This result was supported by a ***significant majority*** of respondents to the consultation. (8/1/22 "Recovery Bonds Classification Consultation Update") (emphasis added).

196.    Bloomberg's Methodology states that, when deciding whether to change a bond's classification, Bloomberg is to "set forth the rationale" for any changes. (Methodology, p. 105). Bloomberg did not do so with respect to its reclassification of Recovery Bonds. Indeed, Bloomberg has never provided any rationale or explanation of how Recovery Bonds "better align" with an ABS classification, why it was changing the classification of these bonds that it had applied since acquiring the Barclay's indexing business in 2016, or how its reclassification

can be reconciled with the views of the SEC, FASB, FINRA, the EU, and other index providers that treat Recovery Bonds as corporate bonds.

197.    When reviewing a bond's classification, Bloomberg's "Methodology" provides that Bloomberg will "evaluate[] all publicly available information [] to assign the most appropriate classification." (Methodology, p. 21). In reclassifying Recovery Bonds as ABS in mid-2022, Bloomberg did not say what information it evaluated or how any such information supported or favored this change of course (other than referencing the "stakeholders' responses" discussed herein).

198.    Bloomberg claims that its indexes are "constructed…in an objective manner," "determined by clearly defined, published eligibility criteria," and "continually monitored and reviewed [] through a formal governance process." (Methodology, p. 12). However, Bloomberg failed to provide an objective reason for the Recovery Bond reclassification. In fact, the reclassification was subjective and not based on "clearly defined, published eligibility criteria." Nor was it monitored or reviewed through a "formal governance process." Bloomberg's reclassification was made in bad faith for the purpose of doing a favor for its large institutional investor customers.

199.    Further, while Bloomberg vows to exercise "expert judgment" in making classification decisions, with respect to reclassifying Recovery Bonds, Bloomberg violated its own policies regarding the exercise of such "judgment." Bloomberg did not explain how its decision was "consistent" with its prior decisions, complied with "written procedures" (none were mentioned) or complied with its "code of ethics to prevent conflicts of interest." (Methodology, p. 107).

200.     Instead of explaining how its reclassification was objective, rules-based, rational, consistent, or ethical, Bloomberg simply said that the reclassification was supported by an informal study of market participants. But under Bloomberg's own Methodology, and under, *inter alia*, IOSCO Principles and IIA's Best Practices, the self-interested wishes of investors are not a valid reason to reclassify. Bloomberg is supposed to be an "umpire" for the fixed income market, and is not supposed to reconsider decisions because self-interested parties ask for a change.

201.     Ironically, the very same month Bloomberg subjectively reclassified Recovery Bonds as ABS, the IIA (of which Bloomberg is a member) sent a letter to the SEC emphasizing the importance of **objectivity** in indexing classification:

> "Indices are designed to measure specified markets **objectively**… If indices were created or maintained as the index provider or another actor wished, as opposed to in accordance with specified rules and methodologies, an index may present inaccurate or inconsistent information, which would ultimately undermine investors' ability to make informed decisions, as well as the index's, and the index provider's, market credibility. Thus, when constructing or rebalancing an index…it is a mechanical process where all of the securities that satisfy the pre-established rules for the index are included…" (8/16/22 IIA letter to SEC, https://www.indexindustry.org/wp-content/uploads/IIA-Response-to-Comment-Request-Final-Signed.pdf) (emphasis added).

202.     Stakeholders' self-interested responses cannot be considered under the EU's BMR, any "code of ethics" or "best practices" unless and until they are reviewed (and culled) for conflicts of interest – e.g., at the very least, if input was sought at all, stakeholders who stood to make hundreds of millions of dollars more from an ABS classification should have been excluded from consideration under any reasonable approach.

203.     In soliciting input as part of its 2022 "consultation" on this issue, Bloomberg failed to cull or properly cull for conflicts of interest.

204.    Bloomberg's misclassification of Recovery Bonds as ABS has already caused millions of dollars in damages to SCE, PG&E and ERCOT electricity customers (in the form of inflated monthly recovery bond payments). Moreover, absent appropriate equitable relief, Bloomberg's misconduct will continue to cause substantial damages to electricity customers for years to come.

205.    Bloomberg's reclassification not only was inconsistent with the views and statements of the SEC, FASB, FINRA, and Bloomberg's own data department, it also violated the EU's BMR, U.K.'s Financial Services and Markets Act 2000 (FSMA), U.K Public General Acts 2000, chapter 8, and the U.S.'s Investment Advisor's Act of 1940, 15 U.S.C. § 80b-1 - b-21 (the "IAA").

206.    Bloomberg also violated the IAA when it responded to customer requests and reclassified Recovery Bonds – moving them from its corporate index to its small, "single-purpose," "stranded-cost" ABS index – Bloomberg acted as an "investment advisor" under the IAA without registering and without accounting for conflicts of interests. Bloomberg's "stranded-cost" ABS index is not designed to track the general market, the bonds are subjectively selected by Bloomberg, and Bloomberg subjectively (and erroneously) included Recovery Bonds in that index in response to its large customers' requests.

207.    Bloomberg also violated the U.K.'s FSMA, which aims to increase market integrity, promote healthy competition and to protect customers. On information and belief, Bloomberg violated the FSMA when it responded to customer requests and reclassified Recovery Bonds – moving them from its corporate index to its small, "single-purpose," "stranded-cost" ABS index – its actions constituted investment advice activities without

authorization and without accounting for conflicts of interests. (FMSA, pt. 19-20.) (FMSA, pt. 1H; section 102A(2-4).).

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS
#### (on behalf of the SCE Class and PG&E Class)

208.    Plaintiffs incorporate all the above paragraphs as though fully set forth herein.

209.    This cause of action is brought by Plaintiffs Skolarus and Small, on behalf of themselves and the SCE Class and PG&E Class.

210.    By its conduct alleged herein, Bloomberg intentionally interfered with the contracts between SCE and PG&E, on the one hand, and those utilities' electricity customers (i.e., Plaintiffs Skolarus and Small and the SCE Class and PG&E Class, respectively) on the other hand, as those contracts relate to monthly payment for electricity service including Recovery Bond repayment charges.

211.    Plaintiff Skolarus and the SCE Class have contracts with SCE that are valid and enforceable.

212.    Plaintiff Small and the PG&E Class have contracts with PG&E that are valid and enforceable.

213.    Bloomberg knew that SCE and PG&E had these contracts with Plaintiffs Skolarus and Small and the SCE Class and PG&E Class, respectively.

214.    Bloomberg's misconduct alleged herein disrupted and interfered with these contracts.

215.    As Bloomberg had intended, Bloomberg's misconduct alleged herein made performance under these contracts more expensive, burdensome, and difficult for Plaintiffs Skolarus and Small and the SCE Class and PG&E Class – such conduct required, and will

continue to require, Plaintiffs Skolarus and Small and the other members of the SCE Class and PG&E Class to pay higher payments each month, higher than they would have to pay but for Bloomberg's misconduct.

216.    Bloomberg intentionally engaged in the misconduct alleged herein to cause the interest rates and corresponding Recovery Bond charges, borne by Plaintiffs Skolarus and Small and the SCE Class and PG&E Class members, to be higher than they would have been but for Bloomberg's misconduct.

217.    Bloomberg intended to make Plaintiffs Skolarus and Small and the SCE Class and PG&E Class members' performance of their contracts more expensive, burdensome, and difficult, and Bloomberg knew that its misconduct alleged herein would make their contractual performance more expensive, burdensome, and difficult.

218.    Bloomberg knew that more difficult, burdensome, and expensive performance of their contracts, for Plaintiffs Skolarus and Small and the SCE Class and PG&E Class members, was certain or substantially certain to occur as a result of Bloomberg's misconduct alleged herein.

219.    Plaintiffs Skolarus and Small and the other members of the SCE Class and PG&E Class have suffered damages, and they will continue to suffer damages throughout the lives of the SCE and PG&E Recovery Bonds at issue in this case, as a result of Bloomberg's unlawful interference alleged herein.

220.    Bloomberg's misconduct alleged herein was a substantial factor and the proximate cause in causing Plaintiffs Skolarus and Small and the SCE Class and PG&E Class members' harm. That harm was a foreseeable result of Bloomberg's conduct. Absent Bloomberg's misconduct alleged herein, that harm would not have occurred.

221.    Plaintiffs Skolarus and Small, on behalf of themselves and the SCE Class and PG&E Class, seek damages, injunctive relief, and the establishment of a trust or other account to be funded by Bloomberg to offset future damages.

222.    Bloomberg acted with oppression, fraud, and malice in engaging in its misconduct alleged herein. Bloomberg's misconduct alleged herein was willful, intentional, and knowing. Punitive damages are properly awarded here.

223.    On information and belief, Bloomberg's misconduct alleged herein was authorized, approved, and/or ratified by its officers, directors, and/or managing agents such that the corporate entities themselves acted with willfulness, intent, oppression, fraud, and malice and punitive damages are properly awarded against these corporations.

224.    Plaintiffs Skolarus and Small further seek an award of attorneys' fees and costs under Cal. Code Civ. Proc. § 1021.5.

**SECOND CLAIM FOR RELIEF**
**TORTIOUS INTERFERENCE WITH A CONTRACT**
**(on behalf of the ERCOT class)**

225.    Plaintiffs incorporate all the above paragraphs as though fully set forth herein.

226.    This cause of action is brought by Plaintiff Steven Tortolani on behalf of himself and the ERCOT Class.

227.    By its conduct alleged herein, Bloomberg tortiously and intentionally interfered with the contracts between ERCOT and the downstream retail electricity providers in the ERCOT system, on the one hand, and the electricity customers in ERCOT's system (i.e., Plaintiff Tortolani and the ERCOT Class) on the other hand, as those contracts relate to payment for electricity service including Recovery Bond repayment charges.

228.    Plaintiff Tortolani and the ERCOT Class have contracts with ERCOT and the downstream electricity providers in the ERCOT system that are valid and enforceable.

229.    Bloomberg knew about these contracts.

230.    Bloomberg's misconduct alleged herein disrupted and interfered with these contracts.

231.    As Bloomberg had intended, Bloomberg's misconduct alleged herein made performance under these contracts more expensive, burdensome, and difficult – such conduct required, and will continue to require, Plaintiff Tortolani and the other members of the ERCOT Class to pay higher payments each month, higher than they would have to pay but for Bloomberg's misconduct.

232.    Bloomberg willfully and intentionally engaged in the misconduct alleged herein to cause the interest rates and corresponding Recovery Bond charges, borne by Plaintiff Tortolani and the ERCOT Class members, to be higher than they would have been but for Bloomberg's misconduct.

233.    Bloomberg intended to make Plaintiff Tortolani and the SCE Class and ERCOT Class members' performance of their contracts more expensive, burdensome, and difficult, and Bloomberg knew that its misconduct alleged herein would make their contractual performance more expensive, burdensome, and difficult.

234.    Bloomberg knew that more difficult, burdensome, and expensive performance of their contracts, for Plaintiff Tortolani and the ERCOT Class members, was certain or substantially certain to occur as a result of Bloomberg's misconduct alleged herein.

235.    Plaintiff Tortolani and the other members of the ERCOT Class have suffered damages, and they will continue to suffer damages throughout the life of the ERCOT Recovery Bond at issue in this case, as a result of Bloomberg's tortious and intentional interference alleged herein.

236.    Bloomberg's misconduct alleged herein was a substantial factor and the proximate cause in causing Plaintiff Tortolani and the ERCOT Class members' harm. That harm was a foreseeable result of Bloomberg's conduct. Absent Bloomberg's misconduct alleged herein, that harm would not have occurred.

237.    Plaintiff Tortolani, on behalf of himself and the ERCOT Class, seeks damages, injunctive relief, and the establishment of a trust or other account to be funded by Bloomberg to offset future damages.

238.    Bloomberg acted with oppression, fraud, and malice in engaging in its misconduct alleged herein. Bloomberg's misconduct alleged herein was willful, intentional, and knowing. Punitive damages are properly awarded here.

239.    On information and belief, Bloomberg's misconduct alleged herein was authorized, approved, and/or ratified by its officers, directors, and/or managing agents such that the corporate entities themselves acted with willfulness, intent, oppression, fraud, and malice and punitive damages are properly awarded against these corporations.

**THIRD CLAIM FOR RELIEF**
**INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**
**(on behalf of the SCE Class, PG&E Class and ERCOT Class)**

240.    Plaintiffs incorporate all the above paragraphs as though fully set forth herein.

241.    Bloomberg intentionally interfered with the economic relationships between Plaintiffs and other members of the SCE Class, PG&E Class, and ERCOT Class, on the one hand, and PG&E, SCE and ERCOT (and the downstream retail electricity providers in the ERCOT system), on the other hand, related to payment for electricity service including Recovery Bonds repayment charges.

242.    Plaintiffs and the members of the SCE Class, PG&E Class, and ERCOT Class were and are in economic relationships with PG&E, SCE and ERCOT (and the downstream

retail electricity providers in the ERCOT system) that are and continue to be probable and likely to result in economic benefits to the Plaintiffs and members of the Classes.

243.    The economic relationships between Plaintiffs and the members of the Classes and PG&E, SCE, and TX ERCOT (and the downstream retail electricity providers in the ERCOT system), respectively, are valid and ongoing.

244.    Bloomberg knew of each of these economic relationships and prospective economic benefits.

245.    Bloomberg's misconduct alleged herein was unfair, false, fraudulent, in violation of its own published statements, in violation of applicable and acknowledged guidelines and standards (including those of regulators and entities and organizations that oversee the industry), and contrary to law, ethics, and common decency. Bloomberg's conduct was wrongful.

246.    By engaging in this misconduct, Bloomberg intended to disrupt these economic relationships and interfere with these prospective economic benefits for Plaintiffs and members of the Classes, including by making Plaintiffs and members of the Classes pay hundreds of millions of dollars more, collectively, than they would be required to pay but for Bloomberg's misconduct.

247.    The economic relationships, and prospective economic benefits for Plaintiffs and the Classes, have been disrupted and interfered with. Plaintiffs and the members of the Classes have been and will continue to suffer harm throughout the life of the Recovery Bonds at issue in this case– including without limitation by having to pay hundreds of millions of dollars more than they should and would have but for the unlawful interference.

248.    Bloomberg willfully and intentionally engaged in the misconduct alleged herein to cause the interest rates and corresponding Recovery Bond charges, borne by Plaintiff

Tortolani and the ERCOT Class members, to be higher than they would have been but for Bloomberg's misconduct.

249.   Bloomberg intended to interfere with the prospective economic benefits for Plaintiffs and the other members of the Classes, and Bloomberg knew that its misconduct alleged herein would have that impact.

250.   Bloomberg knew that such interference with Plaintiffs' and the other members of the Classes' prospective economic benefits was certain or substantially certain to occur as a result of Bloomberg's misconduct alleged herein.

251.   Bloomberg's misconduct was a substantial factor and the proximate cause in causing Plaintiffs' and the members of the Classes' harm. Plaintiffs and the members of the Classes have been and will continue to be damaged in amounts according to proof. That harm was a foreseeable result of Bloomberg's conduct. Absent Bloomberg's misconduct alleged herein, that harm would not have occurred.

252.   Plaintiffs, on behalf of themselves and the Classes, seeks damages, injunctive relief, and the establishment of a trust or other account to be funded by Bloomberg to offset future damages.

253.   On information and belief, Bloomberg acted with oppression, fraud, or malice in making its classification decision such that punitive damages are properly awarded here.

254.   On information and belief, Bloomberg's misconduct here was authorized, approved, and/or ratified by its officers, directors, and/or managing agents such that the corporate entities themselves acted with oppression, fraud, or malice and punitive damages are properly awarded against these corporations.

255.    Plaintiffs Skolarus and Small further seek an award of attorneys' fees and costs under Cal. Code Civ. Proc. § 1021.5.

## FOURTH CLAIM FOR RELIEF
## NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
### (on behalf of the SCE Class, PG&E Class and ERCOT Class)

256.    Plaintiffs incorporate all the above paragraphs as though fully set forth herein.

257.    Bloomberg negligently interfered with the economic relationships between Plaintiffs and the members of the Classes, on the one hand, and PG&E, SCE and ERCOT (and the downstream retail electricity providers in the ERCOT system), on the other hand, related to the payment for electricity service including Recovery Bonds repayment charges.

258.    Plaintiffs and the members of the SCE Class, PG&E Class, and ERCOT Class were and are in economic relationships with PG&E, SCE and ERCOT (and the downstream retail electricity providers in the ERCOT system) that are and continue to be probable and likely to result in economic benefits to the Plaintiffs and members of the Classes.

259.    The economic relationships between Plaintiffs and the members of the Classes and PG&E, SCE, and TX ERCOT (and the downstream retail electricity providers in the ERCOT system), respectively, are valid and ongoing. Bloomberg knew of each of these economic relationships and prospective economic benefits.

260.    Bloomberg owed a duty to Plaintiffs and the members of the Classes, *inter alia*, because Bloomberg was in a unique position of power in indexing the Recovery Bonds, influencing the interest rates for same, and because it was foreseeable by Bloomberg (indeed foreseen by Bloomberg) that its conduct alleged herein would harm Plaintiffs and the members of the Classes in the form of increased payments.

261.    Bloomberg knew or should have known that these economic relationships would be disrupted and made more expensive and difficult for Plaintiffs and the members of the

Classes, and that the prospective economic benefits to Plaintiffs and the members of the Classes would be interfered with, if Bloomberg's classification decision was not made with reasonable care.

262.    Bloomberg was negligent, failed to act with reasonable care, and acted wrongfully.

263.    Bloomberg's misconduct alleged herein was unfair, false, fraudulent, in violation of its own published statements, in violation of applicable and acknowledged guidelines and standards (including those of regulators and entities and organizations that oversee the industry), and contrary to law, ethics, and common decency. Bloomberg's conduct was wrongful.

264.    Bloomberg's negligent, unreasonable, and wrongful classification decision has foreseeably disrupted and continues to disrupt Plaintiffs' and the members of the Classes' economic relationships and prospective economic benefits – requiring them to pay hundreds of millions of dollars more in interest.

265.    Bloomberg's negligent, unreasonable, and wrongful conduct was a substantial factor and the proximate cause in disrupting Plaintiffs' and the members of the Classes' economic relationships and prospective economic benefits, and causing (and continuing to cause) Plaintiffs' and the members of the Classes' harm. That harm was a foreseeable result of Bloomberg's conduct. Absent Bloomberg's misconduct alleged herein, that harm would not have occurred.

266.    Plaintiffs, on behalf of themselves and the Classes, seeks damages, injunctive relief, and the establishment of a trust or other account to be funded by Bloomberg to offset future damages.

267.    Plaintiffs Skolarus and Small further seek an award of attorneys' fees and costs under Cal. Code Civ. Proc. § 1021.5.

**FIFTH CLAIM FOR RELIEF**
**VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE §17200**
**(on behalf of the SCE Class and PG&E Class)**

268.    Plaintiffs incorporate all the above paragraphs as though fully set forth herein.

269.    This cause of action is brought by Plaintiffs Skolarus and Small on behalf of themselves and the SCE Class and PG&E Class.

270.    Bloomberg's conduct described herein violates the "unfair" and "unlawful" prongs of California's Unfair Competition Law (the "UCL"), codified at California Business and Professions Code §§ 17200, et seq.

271.    By its conduct alleged herein, Bloomberg has violated the "unfair" prong of the UCL, including without limitation by: (a) falsely reclassifying Recovery Bonds (including the SCE and PG&E Recovery Bonds at issue in this case) as ABS as a favor to its large institutional investors and at the expense of electricity utility customers; and (b) trying to justify, conceal, and obfuscate such misconduct through a sham "review" or "consultation" process.

272.    Bloomberg' conduct alleged herein is immoral, unethical, oppressive, unscrupulous, unconscionable, and substantially injurious to Plaintiffs Skolarus and Small and the SCE Class and PG&E Class. There is no utility to Bloomberg's conduct, and even if there were any utility, it would be significantly outweighed by the gravity of the harm caused by Bloomberg's conduct alleged herein.

273.    Bloomberg's conduct alleged herein also violates California public policy, including as such policy is reflected in Cal. Civ. Code §§ 1709-1710, and California common law.

274.    By its conduct alleged herein, Bloomberg has also violated the "unlawful" prong of the UCL, including by intentionally interfering with contractual relationships, and intentionally and/or negligently interfering with prospective economic benefits, in violation of California common law, and by violating regulations and other applicable governmental and organizational rules and standards as set forth herein.

275.    By its conduct alleged herein, Bloomberg has benefited itself, including benefits flowing from having done a favor for its large institutional customers.

276.    As a direct and proximate result of Bloomberg's unfair and unlawful conduct, Plaintiffs Skolarus and Small and the SCE Class and PG&E Class members lost money and have lost other property and benefits in which they have a vested interest, including excess monthly payments they have made, and will continue to have to make, as a result of Bloomberg's misconduct alleged herein.

277.    Plaintiffs Skolarus and Small on behalf of themselves and the SCE Class and PG&E Class, seek an order granting restitution, granting injunctive relief, and ordering the establishment of a trust or other account to be funded by Bloomberg to offset past and future harm.

278.    Bloomberg's conduct has caused substantial injury to Plaintiffs Skolarus and Small and the SCE Class and PG&E Class. Bloomberg's conduct is ongoing and will continue absent a permanent injunction. Accordingly, Plaintiffs Skolarus and Small seek an order enjoining Bloomberg from continuing its misconduct alleged herein.

279.    Plaintiffs Skolarus and Small further seek an award of attorneys' fees and costs under Cal. Code Civ. Proc. § 1021.5.

## SIXTH CLAIM FOR RELIEF
### NEGLIGENCE
### (on behalf of the ERCOT Class)

280.    Plaintiffs incorporate all the above paragraphs as though fully set forth herein.

281.    This cause of action is brought by Plaintiff Tortolani on behalf of himself and the ERCOT Class.

282.    Bloomberg owed a duty of at least reasonable care to Plaintiff Tortolani and members of the ERCOT Class in the timing, scope, and terms under which it reevaluated Recovery Bonds classification, *inter alia*, because Bloomberg is part of the interconnected bond market (and in a position of uniquely heavy influence), it made representations that the market relied on, and it was foreseeable (indeed, foreseen by Bloomberg) that ERCOT electricity customers would be financially harmed by Bloomberg's improper reclassification of Recovery Bonds.

283.    Bloomberg breached its duty by acts and omissions including but not limited to:

a.    Announcing the review/consultation which sent a clear signal to the market even in advance of the ERCOT bond issuance;

b.    Instituting a bogus review/consultation over the reclassification;

c.    Distributing misleading information as to the reason for the mid-year review/consultation;

d.    Distributing misleading information as to the relevance of their largest customers' input on reclassification;

e.    Failing to utilize or consider the majority of consultation responses;

f.    Identifying customer opinion, not legal standards, as the only relevant metric for classification; and

g.    Improperly reclassifying Recovery Bonds with knowledge that the reclassification would cause higher interest rates to apply to the bonds and increase costs for electricity customers.

284.    Bloomberg's negligence proximately caused harm to Plaintiff Tortolani and other members of the ERCOT Class.

285.    Plaintiff Tortolani, on behalf of himself and the ERCOT Class, seeks damages, injunctive relief, and the establishment of a trust or other account to be funded by Bloomberg to offset future damages.

286.    Bloomberg's actions and omissions, when viewed objectively from Bloomberg's viewpoint at the time of the actions and omissions, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others. Bloomberg had actual, subjective awareness of the risk, but proceeded with a conscious disregard for the right, safety or welfare of others. Punitive damages are thus warranted.

## SEVENTH CLAIM FOR RELIEF
### NEGLIGENCE
### (on behalf of the SCE Class and PG&E Class)

287.    Plaintiffs incorporate all the above paragraphs as though fully set forth herein.

288.    This cause of action is brought by Plaintiffs Skolarus and Small, on behalf of themselves and the SCE Class and PG&E Class.

289.    Bloomberg's acts or omissions, as described above and below, constitute negligence.

290.    As a Bond Indexer (including given its position of uniquely heavy influence) in the interconnected bond market, Bloomberg had a duty to refrain from reclassifying Recovery Bonds in a manner that would foreseeably cause harm to electricity customers of PG&E and

SCE and to use ordinary care in the timing, scope and terms under which it classified Recovery Bonds.

291.    Bloomberg breached its duty by acts and omissions including but not limited to::

    a.    Instituting a bogus review/consultation over the reclassification;

    b.    Distributing misleading information as to the reason for the mid-year review/consultation;

    c.    Distributing misleading information as to the relevance of their largest customers input on reclassification;

    d.    Failing to utilize or consider the majority of consultation responses;

    e.    Identifying customer opinion, not legal standards, as the only relevant metric for classification; and

    f.    Improperly reclassifying Recovery Bonds with knowledge that the reclassification would cause higher interest rates to apply to the bonds and increase costs for electricity customers.

292.    Bloomberg's breach is the direct and proximate cause of the damage suffered by Plaintiffs Skolarus and Small and other members of the PG&E and SCE Classes.

293.    The damages suffered by Plaintiffs Skolarus and Small and other members of the PG&E and SCE Classes would not have occurred without Bloomberg's negligence in reclassifying Recovery Bonds and the related review/consultation announcements. Bloomberg engaged in the alleged conduct knowing that it would increase the interest rates on the Recovery Bonds and thus the charges to Plaintiffs Skolarus and Small and other members of the PG&E and SCE Classes. Bloomberg had exclusive control over the reclassification and the increased

charges borne by these consumers would not have resulted if Bloomberg had exercised proper care.

294.    Plaintiffs Skolarus and Small, on behalf of themselves and the SCE Class and PG&E Class, seek an order granting damages, granting injunctive relief, and ordering the establishment of a trust or other account to be funded by Bloomberg to offset future harm.

295.    Plaintiffs Skolarus and Small further seek an award of attorneys' fees and costs under Cal. Code Civ. Proc. § 1021.5.

<strong><u>PRAYER FOR RELIEF</u></strong>

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

a.    Determining that this action is a proper class action, and certifying the Classes, designating Plaintiffs as class representatives, and designating their counsel as Class Counsel under Rule 23 of the Federal Rules of Civil Procedure;

b.    Awarding compensatory damages in favor of Plaintiffs and the Classes against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c.    Awarding Plaintiffs and the Classes restitution;

d.    Awarding Plaintiffs and the Classes their costs and expenses incurred in this action, including attorneys' fees and expenses and expert fees;

e.    Ordering the establishment of a trust or other account to be funded by Defendants to offset past and future harm to Plaintiffs and the Classes;

f.    Awarding equitable/injunctive relief, as the Court may deem just and proper;

g.    Awarding punitive damages against Defendants to each of the Classes;

h.    Awarding pre-judgment and post-judgment interest; and

       i.     Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs, on behalf of themselves and each of the classes, hereby demand a trial by jury.

DATED this 7 day of June, 2024          Respectfully submitted,

                             **PAUL LLP**

                     By: */s/ Sahil S. Koul*
                             Sahil S. Koul (NY Bar No. 5932439)
                             PAUL LLP
                             15 Crest Wood Circle
                             Pittsford, New York 14534
                             Telephone: (816) 984-8100
                             Facsimile: (816) 984-8101
                             Sahil@PaulLLP.com

                             Richard M. Paul III (*pro hac vice forthcoming*)
                             Michael Schrag (*pro hac vice forthcoming*)
                             PAUL LLP
                             601 Walnut, Suite 300
                             Kansas City, Missouri 64106
                             Telephone: (816) 984-8100
                             Facsimile: (816) 984-8101
                             Rick@PaulLLP.com
                             Michael@PaulLLP.com

                             Roger N. Heller (*pro hac vice forthcoming*)
                             LIEFF CABRASER HEIMANN &
                             BERNSTEIN, LLP
                             275 Battery Street, 29th Floor
                             San Francisco, CA 94111
                             Telephone: (415) 956-1000
                             Facsimile: (415) 956-1006
                             rheller@lchb.com

-70-

Michael G. King (*pro hac vice forthcoming*)
HENNELLY & GROSSFELD LLP
10900 Wilshire Blvd.
Suite 400
Los Angeles, CA 90024
Telephone: 310-305-2100
Facsimile: 310-305-2116
mking@hgla.com

*Attorneys for Plaintiffs and the Proposed Classes*