UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EDWARD SKOLARUS, et al., *on behalf of themselves and all others similarly situated*,<br><br>Plaintiffs,<br><br>-against-<br><br>BLOOMBERG, L.P. and BLOOMBERG INDEX SERVICES, LTD.,<br><br>Defendants. | 1:24-cv-04375 (ALC)<br><br>**OPINION & ORDER** |

**ANDREW L. CARTER, JR., United States District Judge:**

Plaintiffs Edward Skolarus, Joshua Cain, Yaffa Lawson, James Small, Cassandra Arnold, Steven Tortolani, and Michael Katzman bring this action on behalf of themselves, and all others similarly situated, against Bloomberg, L.P. and Bloomberg Index Services, Ltd. to address allegedly higher utility rates they pay on their states' recovery bonds resulting from defendants' indexing classifications. Defendants move to dismiss the amended complaint as barred by the filed rate doctrine and for failure to state a claim. For the reasons that follow, the motion is granted.

## BACKGROUND

### I. Factual History

#### a. The Parties

Plaintiffs Edward Skolarus, Joshua Cain, Yaffa Lawson, James Small, Cassandra Arnold, Steven Tortolani, and Michael Katzman (collectively "Plaintiffs") are all residential electricity customers in Texas and California. *See* ECF No. 28 ¶ 4 ("Amended Complaint" or "AC"). They receive power through regional utility providers, including the Electric Reliability Council of Texas ("ERCOT"), Southern California Edison Company ("SCE"), and Pacific Gas and Electric Company ("PG&E") (together, the "Utilities"). *See id.* ¶ 21.

Defendant Bloomberg L.P. is a privately held company headquartered in New York that provides financial data, software, and index services. *See id.* ¶ 32. Defendant Bloomberg Index Services Limited (with Bloomberg L.P. "Bloomberg" or "Defendants"), a wholly owned subsidiary of Bloomberg L.P., is domiciled and incorporated in the United Kingdom and conducts business in the United States. *See id.* ¶ 33. Together, Defendants act as bond indexers, publishing benchmark indices that classify bonds for investors. *See id.* ¶¶ 11–12, 59.

b. <u>Recovery Bonds and the Regulatory Framework</u>

Utility companies issue recovery bonds to recoup the costs of large, often one-time, expenses. *See id.* ¶ 74. Plaintiffs allege that recovery bonds are typically purchased by large institutional investors and are repaid by electricity consumers through non-bypassable charges on their bills. *See id.* ¶¶ 3, 5, 16. These bonds carry little if any risk because the Utilities have quasi-monopolies in their geographic regions, and customers are compelled participants who can only avoid payment by moving. *See id.* ¶¶ 3, 7, 75, 80, 115. As such, customers cannot avoid repayment obligations and bear the cost of interest rates set in the market. *See id.* ¶¶ 115–116, 120.

At issue in this litigation are four specific sets of recovery bonds. *See id.* ¶ 2. First, the ERCOT Texas Stabilization Subchapter N Bonds issued in June of 2022 for $2.1 billion ("ERCOT Bonds"). *See id.* Second, the PG&E Senior Secured Recovery Bonds, Series 2022-A issued in November of 2022 for $983 million ("PG&E 2022 Bonds"). *See id.* Third, the SCE Senior Secured Recovery Bonds, Series 2023-A issued in April of 2023 at $775 million ("SCE Bonds"). *See id.* And last, the PG&E Senior Secured Recovery Bonds, Series 2024-A issued in August of 2024 for $1.42 billion ("PG&E 2024 Bonds"). *See id.* Plaintiffs allege that the Utilities issued these recovery bonds to finance storm-and wildfire-related costs. *See id.* ¶¶ 81–82, 89–90, 98.

In Texas, the Public Utility Commission ("TPUC") approves applications for recovery bond issuances under Texas Utility Code Setion 39.653(a). Likewise, the California Public Utilities Commission ("CPUC," with TPUC "the PUCs") reviews similar applications under California Public Utility Code Section 850.1(a). Before the four sets of recovery bonds were issued, the Utilities submitted the bonds' terms and rates to the PUCs for their review. *See* ECF No. 37 at 3–4 (citing the exhibits to ECF No. 38 (the letters submitted to the PUCs)).[1] In all four sets of recovery bonds, the interest rates were market-based rates ("MBRs"); in other words the rates were "set by the market based in part on how the bonds are, or will be, classified in bond indices." AC ¶ 1.

c. The Reclassification and Alleged Harm

As an indexer, Plaintiffs allege Bloomberg compiles, creates methodologies for, sponsors, administers, determines the particular market that the index measures, and licenses market indices. *See id.* ¶¶ 11–13, 59. Purportedly, "Bloomberg has a dominant market position in the fixed-income index universe." *Id.* ¶ 61. Its indexing decisions impact the interest rates on recovery bonds. *See* ECF No. 48 at 1.

In the summer of 2022, Bloomberg reclassified recovery bonds from the corporate bond index to the asset-backed securities ("ABS") index. *See* AC ¶¶ 16, 153, 187. Plaintiffs allege the ABS classification is perceived as riskier and therefore results in those securities carrying higher interest rates. *See* ECF No. 48 at 6. According to Plaintiffs, recovery bonds were reclassified at the request of certain large institutional investors who stood to benefit from the reclassification. *See*

---

[1] The Court takes judicial notice of these public records. *See Williams v. New York City Hous. Auth.*, 816 F. App'x 532, 534 (2d Cir. 2020). The Court also takes judicial notice of the issuance orders, which both parties cite and include as exhibits to their briefing. *See* ECF Nos. 38, 47.

AC ¶ 17. Plaintiffs contend that Defendants knew the reclassification would reduce the pool of eligible investors, diminish competition, and thereby increase the interest rates on recovery bonds. *See id.* ¶ 20.

Plaintiffs allege that the resulting higher interest rates were passed directly to consumers through increased utility charges. *See id.* ¶ 120. They assert that as a result of Bloomberg's reclassification, millions of electricity customers in California and Texas, including the named Plaintiffs, have paid and will continue to pay higher monthly electricity bills. *See id.* ¶ 2. Plaintiffs estimate that over the lifetime of the four sets of recovery bonds, these increased charges will amount to hundreds of millions of dollars in additional interest borne by consumers. *See id.* ¶ 19.

## II. Procedural History

On June 7, 2024, Plaintiffs filed the complaint initiating this action. *See* ECF No. 1. On September 26, 2024, Plaintiffs filed their amended complaint, asserting intentional interference with contractual relations and six other causes of action. *See* ECF No. 28.

On December 6, 2024, Defendants filed their motion to dismiss. *See* ECF Nos. 36, 37 ("Mot."). On January 17, 2025, Plaintiffs filed their opposition. *See* ECF No. 48 ("Opp."). On February 14, 2025, Defendants filed their reply. *See* ECF No. 49 ("Reply").

## STANDARD OF REVIEW

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

(citing *Twombly*, 550 U.S. at 556). The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully," and accordingly, where the plaintiff alleges facts that are "'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

In considering a motion to dismiss, courts accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See Goldstein v. Pataki*, 516 F.3d 50, 56 (2d Cir. 2008). However, the court need not credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555); *see also id.* at 681. Instead, the complaint must provide factual allegations sufficient "to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*, 507 F.3d 117, 121 (2d Cir. 2007) (citing *Twombly*, 550 U.S. at 555). In addition to the factual allegations in the complaint, the court may consider "the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010) (internal quotation omitted).

## DISCUSSION

Bloomberg moves to dismiss the amended complaint as barred by the filed rate doctrine and for failure to state a claim. The Court first addresses the filed rate doctrine.

### I.  Filed Rate Doctrine

Under the filed rate doctrine, "any filed rate—that is, one approved by the governing regulatory agency—is *per se* reasonable and unassailable in judicial proceedings brought by

ratepayers." *Rothstein v. Balboa Ins. Co.*, 794 F.3d 256, 261 (2d Cir. 2015) (quoting *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 18 (2d Cir. 1994)) (internal quotation marks omitted).

> The doctrine is grounded in two related principles: first, the principle of nonjusticiability, i.e. "that courts should not undermine agency rate-making authority by upsetting approved rates"; and second, the principle of nondiscrimination, i.e. "that litigation should not become a means for certain ratepayers to obtain preferential rates."[2]

*Lyons v. Litton Loan Servicing LP*, 158 F. Supp. 3d 211, 224 (S.D.N.Y. 2016) (quoting *Rothstein*, 794 F.3d at 261).

"The filed rate doctrine has a wide reach." *Id.* And "[w]hen [it] applies, it is rigid and unforgiving." *Simon v. KeySpan Corp.*, 694 F.3d 196, 205 (2d Cir. 2012). If a claim implicates the doctrine's underlying twin aims, the doctrine may bar judicial consideration regardless of the nature of the rate, the claim, or the defendant. The filed rate doctrine applies to rates approved by both state and federal regulators, and rates set directly and those by the market. *See id.* at 204–05. It bars both federal and state causes of action, and encompasses those "characterized as challenging something other than the rate itself." *Rothstein*, 794 F.3d at 262. Additionally, the claim need not be asserted against the rate-setter for the doctrine to apply. *See Simon*, 694 F.3d at 200 (barring claims against Morgan Stanley for facilitating anticompetitive conduct under the filed rate doctrine). "The underlying conduct does not control whether the filed rate doctrine applies. Rather, the focus for determining whether the filed rate doctrine applies is the impact the court's decision will have on agency procedures and rate determinations." *Lyons*, 158 F. Supp. 3d at 228 (quoting *Coll v. First Am. Title Ins. Co.*, 642 F.3d 876, 888–90 (10th Cir. 2011)) (internal citation and quotation marks omitted).

---

[2] The Parties agree that the nondiscrimination principle is not implicated here. *See* Opp. at 8 n.4.

To determine whether the filed rate doctrine is applicable to the amended complaint at hand, the Court must first decide whether Plaintiffs' challenge to Bloomberg's index reclassification is properly considered a challenge to the reasonableness of the interest rates. If so, the Court must then determine whether the PUCs exercised their rate-making authority over the challenged rates.

a. Whether the Rates Are Challenged

While Plaintiffs do not seem to contest that they challenge the rates, they do not concede it explicitly either. Plaintiffs state that Bloomberg's unregulated index classifications are the target of this litigation. *See* Opp. at 8. Bloomberg's decision to reclassify recovery bonds, from the corporate to the ABS index, will allegedly "cause Plaintiffs and class members to pay hundreds of millions of dollars in additional interest" through their utility bills. *Id.* at 1. It is therefore this higher interest rate which caused Plaintiffs' injuries and may eventually inform their damages award. *See, e.g.*, *Marcus v. AT&T Corp.*, 138 F.3d 46, 61 (2d Cir. 1998) (applying the filed rate doctrine because plaintiffs' ultimate request was to be excused from paying the tariff); *Fax Telecommunicaciones Inc. v. AT&T*, 138 F.3d 479, 489–90 (2d Cir. 1998) (applying the doctrine because plaintiffs' fraudulent inducement claim was ultimately aimed at receiving a lower rate); *Wegoland*, 27 F.3d at 21 (applying the doctrine because plaintiffs' fraud claim required the court to determine a reasonable rate absent the fraud to award damages). As Plaintiffs' claims are inexorably tied to the higher interest rates allegedly caused by the reclassification, this action is properly construed as a challenge to the rates on the four sets of recovery bonds.

Plaintiffs assert that, even if this action does challenge the interest rates, the rates cannot properly be attributed to the PUCs' rate-making authority and therefore the filed rate doctrine's

nonjustiability principle is not implicated. *See* Opp. at 8–12. To address this, Court considers whether the market-based interest rates were a product of the PUCs' rate-making authority or a private unregulated actor.

### b. Whether the PUCs Exercised Rate-Making Authority

In *Simon v. KeySpan Corporation*, the Second Circuit addressed whether the filed rate doctrine applies to rates which are based on the market or only to those directly approved by a regulator. *See* 694 F.3d 196 (2d Cir. 2012). The Circuit found the doctrine not to be so strict. It noted that the Federal Energy Regulatory Commission (FERC)—the federal counterpart to the state PUCs at issue here—"ha[d] chosen to exercise its rate-setting authority in this market by establishing an MBR auction process." *Id.* at 207. FERC had "tightly control[led] the auction process and . . . exercised its ability to undertake individual review of the MBR to ensure that anti-competitive practices did not undermine the process it created." *Id.* The Circuit found the rationales behind the filed rate doctrine "applie[d] with equal force" to such an MBR process. *Id.* More broadly, the Circuit held the filed rate doctrine to apply

> where the regulator created a process for setting rates, reviewed the resulting rates, and, after investigation, determined that the anti-competitive behavior did not undermine its process and that the resulting rates were reasonable.

*Id.* at 208.

As one of only two cases where the Circuit has evaluated MBRs in the context of the filed rate doctrine, *see Entergy Nuclear Vermont Yankee, LLC v. Shumlin*, 733 F.3d 393, 432–33 (2d Cir. 2013) (mentioning defendants' filed rate doctrine argument, but ultimately affirming dismissal of the claims as unripe), *Simon*'s holding is instructive but limited. While the Circuit found the "filed rate doctrine can apply beyond rates set directly by an agency," *Simon*, 694 F.3d at 205–06, it explicitly cabined the holding to MBR processes that are "sufficiently safeguarded," *id.* at 207.

8

The Circuit elected not to decide the applicability of the filed rate doctrine to all MBR processes *per se*, writing:

> It is not clear to us that the filed rate doctrine, and the rationales underlying it, should preclude all court scrutiny of alleged anti-competitive behavior affecting the setting of MBRs. The Supreme Court's three rationales from *Keogh* do not apply with equal force to rates set by MBRs when the only involvement by a regulator is creating the process ultimately corrupted by parties in the market.

*Id.* at 206 (citing *Keogh v. Chicago & N.W. Ry. Co.*, 260 U.S. 156 (1922)). The Circuit concluded: "There is no need for us to reach the question of whether the filed rate doctrine would apply to all MBRs irrespective of the oversight of the regulator, and we leave that question for another day." *Id.* at 208.[3] Accordingly, to decide whether the filed rate doctrine is germane, the Court must determine whether the PUCs merely created a rate-setting process that was fully governed by the market or one where they maintained sufficient oversight.

The Court identifies three factors assessed in *Simon* to evaluate the level of control exercised by the regulator in setting a market-based rate: (1) whether the regulator established the rate-setting process; (2) whether the regulator had the power to review the resulting MBR; and (3) whether the regulator had the power to investigate influences on the MBR and employed that power. *See Simon*, 694 F.3d at 208 (finding FERC tightly controlled the rate-making process because it established the process, reviewed the rates, and used its investigative powers). Plaintiffs

---

[3] Such a holding mirrors the position taken in other circuits. *See, e.g.*, *E. & J. Gallo Winery v. EnCana Corp.*, 503 F.3d 1027, 1040 (9th Cir. 2007) ("[S]o long as FERC 'continues to engage in regulatory activity' and has not effectively abdicated its rate-making authority, FERC's approval of market-based rates" is covered by the filed rate doctrine. (citing *Pub. Util. Dist. No. 1 of Grays Harbor County Wash. v. IDACORP Inc.*, 379 F.3d 641 (9th Cir. 2004))); *Ellis v. Salt River Project Agric. Improvement & Power Dist.*, 24 F.4th 1262, 1276 (9th Cir. 2022) (finding the filed rate doctrine does not apply "to unilateral, unsupervised rate-setting by a market participant"); *but see PNE Energy Supply LLC v. Eversource Energy*, 974 F.3d 77, 86–87 (1st Cir. 2020) (applying the filed rate doctrine to MBRs broadly because complaints about a regulator's diligence over the rate-setting process "need [to] be raised with FERC and Congress, not with a jury").

do not dispute that the PUCs created the rate-making process. *See generally* Opp. Therefore, the Court will turn to the PUCs' review first.

> i. *Powers to Review and Find the Rates to Be Reasonable*

Plaintiffs unambiguously oppose interpreting the PUCs' actions in the rate-setting processes as approvals of the MBRs or determinations that the MBRs were reasonable. *See id.* at 10–12. Plaintiffs highlight that the PUCs "approved the *issuance* of the four bonds months before they knew the actual market-based interest rates." *Id.* at 10 (emphasis in original). Plaintiffs recognize that the PUCs were apprised of the actual rates before the bonds in fact issued and had the power to withhold their issuance if the PUCs disapproved of the actual MBRs. *See id.* at 11. Nevertheless, Plaintiffs argue the PUCs did not find the actual MBRs to be reasonable by issuing the bonds because to reject their issuance "would have forced the [U]tilities to forego the benefits of securitization entirely or otherwise finance their debt in a more expensive way, resulting in much higher costs to utilities and/or customers." *Id.* Essentially, Plaintiffs argue that the PUCs' power to withhold issuance cannot be equated with a regulator's power to approve or adjust interest rates. *See id.*[4]

Bloomberg highlights on reply that Plaintiffs' issue with the short timeline between the rate approval and bond issuance is one with "the PUC process for approving the interest rates [and]

---

[4] The Court notes that the only authority Plaintiffs cite in support of these arguments is *Carlin v. DairyAmerica, Incorporated*, 705 F.3d 856, 878 (9th Cir. 2013). *See* Opp. at 9–11. In *Carlin*, the Ninth Circuit declined to apply the filed rate doctrine because the regulator explicitly recognized the rates were incorrect due to the defendant's misconduct "*at the time they were filed*." 705 F.3d at 879 (emphasis added). This recognition constituted a rejection of the rates, precluding the filed rate doctrine's application. *See id.* at 877–78 (citing *ICC v. American Trucking Ass'n*, 467 U.S. 354 (1984)). Plaintiffs do not allege that the PUCs rejected the bond rates *at the time they were filed* and instead cite to a 2024 letter from the National Association of Regulatory Utility Commissioners (NARUC) expressing opposition to the index reclassification. *See* Opp. at 11 (The "NARUC resolution shows the utility regulators expressly disapprove." (citing ECF No. 47-1)). Based on this collective letter, the Court is not inclined to rely on the out of Circuit precedent nor find the PUCs *in this matter* have rejected the recovery bond rates.

not a basis for Plaintiffs' contention that the PUCs did not approve them." Reply at 4. The Court agrees. As determined in *Simon*, the rates need not be approved by a regulator if the regulator reviews them and maintains other safeguards against market manipulation. *See* 694 F.3d at 207–08; *see also Texas Com. Energy v. TXU Energy, Inc.*, 413 F.3d 503, 506–10 (5th Cir. 2005) (applying the filed rate doctrine to MBRs administered by ERCOT and reviewed by the TPUC because the commission maintained "oversight over the market"). It is clear from Plaintiffs' own pleading that Bloomberg's announcements and official index reclassifications allegedly had an impact on the rates before the bonds were issued; it is in fact necessary to their claims or else Plaintiffs would not have an injury on which to proceed. *See* AC ¶¶ 181–83. That the PUCs did not select to withhold the issuance of the bonds—whether or not it was because of the economic pressures suggested by Plaintiffs—is sufficient to find the PUCs assessed the actual rates to be reasonable under the rate-making processes they developed.

Critically, that the PUCs approved ranges of rates rather than one singular MBR does not change this result. *See* Mot. at 6. Where a regulator is aware of the range of rates that may be potentially applied upon its review and the challenged rates fall within that range, such rates are reasonable and therefore barred by the filed rate doctrine. *See Korte v. Allstate Ins. Co.*, 48 F. Supp. 2d 647, 652 (E.D. Tex. 1999) ("[A]lthough the commissioner does not establish the actual rates, but only the benchmark rate, the rates filed within the flexibility band are effective and presumed to be valid."); *Royal Mile Co. v. UPMC*, No. 10-1609, 2013 WL 5436925, at *22 (W.D. Pa. Sept. 27, 2013) ("Regardless whether the rates within a permissible range set forth by statute are filed with the regulatory agency, the agency's approval of the filed base rate and rates within fifteen percent of that range renders those rates—actually filed or not—legally enforceable rates."). This

is consistent with the district court's observation in *Simon* that "the prices charged by KeySpan were consistent with FERC's expectations when it approved the MBR . . . and the price rules set forth therein." *Simon v. KeySpan Corp.*, No. 10 CIV. 5437, 2011 WL 2135075, at *2 (S.D.N.Y. May 27, 2011). As such, the Court finds that the PUCs determined the actual MBRs to be reasonable.

### ii. Power to Investigate Influences on Rates

The short timeline between the Utilities' submission and the recovery bonds' issuance may bear a greater weight on the PUCs' investigative powers. In the case of the ERCOT bonds—which were issued the same month as Bloomberg's reclassification announcement and the submission of the actual MBRs—the Court recognizes that the PUCs had little time to conduct any meaningful investigation on what influenced the rates. *Compare* AC ¶ 153 (noting Bloomberg's announcement on June 8, 2022), *with* ECF No. 38-5 (ERCOT letter setting forth the actual MBRs dated June 9, 2022), *with* AC ¶ 2 (noting the issuance of the ERCOT Bonds in June of 2022). The Court additionally notes that the PUCs maintained no power to adjust the rates after the bonds issued, so any discoveries of market manipulation would be moot thereafter. *See* Opp. at 9 ("The PUCs also lack any mechanism to remedy indexing manipulation—they cannot investigate or punish Bloomberg, nor can they promulgate rules governing bond classification.").

Even so, this is not a situation—like that in *Simon*—where the alleged market manipulation was conducted by colluding parties or executed in secret. *See Simon v. KeySpan Corp.*, 694 F.3d 196, 198–200 (2d Cir. 2012) (detailing the anti-competitive agreement); *Royal Mile*, 2013 WL 5436925, at *4 (same). As Plaintiffs claim, Bloomberg's announcement that it was considering the index reclassification, and its eventual announcement of the decision to reclassify, were not secret.

*See* AC ¶¶ 153, 158, 180, 187–88 (noting Bloomberg's final announcement on August 1, 2022). They were in fact so widely received that Plaintiffs allege it fundamentally influenced the market's response. *See id.* ¶ 181 ("The timing of the announcements was intended to increase the interest rate on Recovery Bonds issued even before formal reclassification."). This demonstrated little need for any investigative abilities in this case. This point is even stronger for the other recovery bonds which were issued 3 months, 8 months, and two years after Bloomberg finalized the index reclassification. *See* AC ¶ 2 (noting the PG&E 2022 Bonds were issued in November of 2022, the SCE Bonds in April of 2023, and PG&E 2024 Bonds in August of 2024).

Plaintiffs do not allege that the resulting rates were greater than those submitted to the PUCs by the Utilities before the recovery bonds issued. This leaves little basis for the Court to conclude that the PUCs would have needed to utilize any authority to adjust the rates since the challenged rates were found to be reasonable. The Court must defer to the PUCs' institutional competence and cannot engage in rate-making to determine what the PUCs would have approved absent the index reclassification. *See Royal Mile*, 2013 WL 5436925, at *25 ("The court in accordance with the nonjusticiability strand must defer to the institutional competence of the PID, which determined the rates charged . . . were not excessive, inadequate or unfairly discriminatory, and cannot engage in the ratemaking process to determine what rates Highmark should have charged."). Any other conclusion would run afoul of the nonjusticiability principle the filed rate doctrine specifically aims to address.

Without any allegation that the challenged rates were beyond the approved ranges—or that the index reclassification could have resulted in rates which the PUCs lacked the ability to regulate—the Court must conclude that the rates were a result of the PUCs' rate-making authority.

The Court finds the PUCs deemed the challenged market-based rates reasonable upon the issuance of the recovery bonds. Further, the Court finds that the rate-setting process maintained sufficient safeguards against the alleged market manipulation at issue. In light of these factors identified in *Simon*, the Court finds the filed rate doctrine bars Plaintiffs' claims and grants Bloomberg's motion to dismiss them.[5]

## II.     Leave to Amend

While leave to amend should be "freely give[n] . . . when justice so requires," Fed. R. Civ. P. 15(a)(2), leave may be denied "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (internal quotation omitted). "[I]t is within the sound discretion of the district court to grant or deny leave to amend." *Kim v. Kimm*, 884 F.3d 98, 105 (2d Cir. 2018) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007)) (internal quotation marks omitted). Where a plaintiff does not even request leave to amend, a district court may decline to grant leave to amend *sua sponte*. *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125–26 (2d Cir. 2013) ("While leave to amend under the Federal Rules of Civil Procedure is freely granted, no court can be said to have erred in failing to grant a request that was not made." (citations and internal quotation marks omitted)).

Plaintiffs do not request leave to amend, nor do they identify any factual allegations in their opposition which indicate a second amended complaint would meet a different fate. *See generally* Opp.; *see also Simon v. Keyspan Corp.*, 785 F. Supp. 2d 120, 140–41 (S.D.N.Y. 2011)

---

[5] The Court notes again that such a finding bars all the causes of action since they all target the reasonableness of the rates. *See supra*; *Rothstein v. Balboa Ins. Co.*, 794 F.3d 256, 262 (2d Cir. 2015) ("[A] claim may be barred even if it can be characterized as challenging something other than the rate itself.").

("[P]laintiff's claims have been dismissed, as a matter of law. . . . There are no allegations that plaintiff could add that could possibly rescue his claims."). Accordingly, leave to amend is denied.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss the amended complaint is **GRANTED**. The motion to stay discovery is **DENIED** as moot. The Clerk of Court is respectfully directed to terminate the pending motions at ECF Nos. 36 and 39, enter judgment, and close this case.

**SO ORDERED.**

**Dated:  September 30, 2025**
**New York, New York**

_____
**ANDREW L. CARTER, JR.**
**United States District Judge**